**Earl HAWTHORNE and Michael Myrick, Appellants,**

v.

**UNITED STATES, Appellee.**

Nos. 83–1269, 84–292.

District of Columbia Court of Appeals.
Argued July 10, 1985.
Decided Jan. 24, 1986.
As Corrected Feb. 10, 1986.

582

Richard S. Stolker, Rockville, Md., for appellant Hawthorne.

Jennifer P. Lyman, Public Defender Service, with whom James Klein and Mark S. Carlin, Public Defender Service, Washington, D.C., were on the brief, for appellant Myrick.

Wendy Bebie, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell and Thomas J. Tourish, Jr., Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before MACK, FERREN and ROGERS, Associate Judges.

FERREN, Associate Judge:

A jury convicted appellants Hawthorne and Myrick of first-degree felony murder while armed, D.C.Code §§ 22–2401, –3202 (1981), and armed robbery, *id.* §§ 22–2901, –3202. Hawthorne contends on appeal that the trial court abused its discretion in denying his motion for severance and erred in failing to ensure proper redaction of his co-defendant's admissions, in refusing to permit defense counsel to revive a witness' memory, and in finding Hawthorne's confession voluntary. Appellant Myrick contends that he was denied his right to a fair trial by the government's knowing use of false testimony by two key witnesses, and that the court abused its discretion in denying his motion for a new trial based on newly discovered evidence of perjury at trial. Because we conclude that any error was harmless under the circumstances and that there was no abuse of discretion, we affirm all convictions.

## I.

This case relates to the mid-day execution-style killing of a drug dealer on November 5, 1981. The evidence at trial tended to show that five persons were together in an alley at the time of the killing: appellants Hawthorne and Myrick, Melvin Thomas,[1] Leroy Farley,[2] and William Michael Reed, the murder victim. There was conflicting evidence as to how, and in what order, these persons entered and (except for Reed) left the alley, and as to who was armed.

Before trial, appellant Hawthorne filed a motion to suppress an oral statement to the police. On the day of Hawthorne's arrest, the police had read him his rights, and he

had indicated he understood them and was willing to answer questions. The next day, Officer Douglas Norris questioned Hawthorne. Norris showed him form PD 47, asked Hawthorne if he understood his rights, told Hawthorne he did not have to make a statement, and added that anything he said could be used against him. Hawthorne replied that he did not want to talk to an attorney and wanted to make a statement. He declined, however, to reduce it to writing.

The court denied Hawthorne's motion to suppress, concluding that he had "knowingly and intelligently waived [his] rights and voluntarily made the statement that is the subject of this litigation." That statement, as memorialized in a police report, was introduced into evidence. In this statement, Hawthorne admitted that he, along with Myrick, Farley, and Thomas, had planned to rob Reed, and that his role during the actual robbery had been to bring Reed into the alley, holding a gun on him.

At trial, Catherine Pounds, a drug user acquainted with most of the principals in the case, provided the basis for the government's "economic" theory of the killing: appellants had murdered Reed, a competing drug dealer, because he was underselling them. Pounds testified that, in the fall of 1981, "Heavy" Hinton and Curleytop were the only wholesale suppliers of pills in the area. Reed distributed pills for Hinton. Myrick distributed pills for Curleytop, and Hawthorne sometimes "juggled" pills for Myrick. As a result, Myrick and Reed competed for sales in the area, although Reed regularly undercut Myrick's price.

Pounds further testified that, on the day of the crime, she overheard Myrick make a threatening statement about Reed.[3] She

---

1. Melvin Thomas was a co-defendant who requested, and was granted, a severance before the trial began.

2. Leroy Farley was a co-defendant for whom the charges in this case were dismissed as part of a plea bargain in which he agreed, among

other things, to testify for the government at the trial of the others.

3. Pounds testified that Myrick said to Melvin Thomas, " 'We're not gonna let an out-of-towner come in and take over.'" Reed had recently come to the District from Philadelphia.

saw Reed and Thomas enter the alley, then later saw Myrick, Hawthorne, and Thomas exit the alley. Myrick was carrying "something black." On cross-examination, defense counsel challenged Pounds' belated reporting to the police of the identities of the men she had seen fleeing, as well as her description of Hawthorne's height. Counsel also impeached Pounds with her pending drug charges, suggesting that she expected favorable treatment from the government in exchange for her testimony.

Jacqueline Butler, another drug user familiar with the area, testified that Myrick had told her several times he did not want Reed in the area selling drugs. He repeated this sentiment on the day of the crime and showed Butler a gun in the waistband of his pants. She later saw Myrick and someone named "Pete" approach Reed.[4] Butler left the area briefly to buy drug paraphernalia. When she returned, she heard three shots and saw three men—Myrick, "Pete," and an unidentified other person—running out the alley.[5] Defense counsel extensively impeached Butler with prior convictions.[6]

Leroy Farley was the only eyewitness to the murder, other than appellant Myrick, who testified at trial.[7] He testified that, on the day of the murder, Myrick had said he was going to rob Reed. Appellant Hawthorne, who was also present, had asked if he could join Myrick, and they walked off. Farley saw no weapons at this time. Farley, who wanted to see what would happen, looked into one entrance of the alley accompanied by Melvin Thomas. They saw Myrick and Hawthorne enter the alley from the other side, along with Reed. Myrick and Hawthorne pulled out guns and robbed and killed Reed.[8] Thomas and Farley then ran in opposite directions. Defense counsel extensively questioned Farley, who initially had been charged with Reed's murder along with appellants, about his plea bargain with the government.

Nancy McIntyre, who lived in the neighborhood of the crime, testified that she had heard the shots fired and saw a man "carrying something in his left hand" run out of the alley. She did not see his face.

Appellant Myrick took the stand in his own behalf. He testified that he was present but played no role in the killing. Melvin Thomas and Leroy Farley planned the robbery, he said, and forced Myrick to go along because he knew of their plan. At first, Myrick saw no weapons. Reed, Farley, and Hawthorne were already in the alley when Thomas and Myrick approached them. Farley, Thomas, and Hawthorne pulled out guns. Farley took something out of Reed's pocket and then shot Reed. Myrick ran. He heard a second shot but did not know who fired it.

Defense counsel, in an attempt to take the sting out of an inconsistency between a statement Myrick had made to the police and his testimony at trial, elicited from Myrick that Melvin Thomas had threatened him. Myrick, therefore, had been afraid to tell the police that Thomas had participated in the killing. The prosecutor impeached Myrick with other inconsistencies and cross-examined him regarding motive.

After his conviction, Myrick filed a new trial motion on July 18, 1983. He alleged that Catherine Pounds' eventual guilty

---

4. Although Catherine Pounds had referred to Hawthorne as "Pete," Butler testified that the "Pete" to whom she was referring was not Hawthorne.

5. Butler testified that the third person was not Melvin Thomas. Butler knew who Thomas was and had seen him in the area earlier on the afternoon of the crime.

6. Butler initially denied a theft conviction in Seat Pleasant, Maryland in July 1981. After her testimony, she left the court house. After the

court issued a bench warrant to assure Butler's return, she was recalled to the stand and admitted the conviction. Defense counsel strenuously questioned Butler, forcing her to admit that she had lied under oath to the jury.

7. Farley's testimony also confirmed that Myrick had an economic motive for the murder.

8. Farley testified that he saw Myrick shoot Reed in the head. At this point, Farley fled. Although he heard two more shots, he was not sure who fired them.

pleas to drug charges demonstrated that she had testified falsely when she denied guilt of these charges at his trial. At Pounds' sentencing hearing on September 14, 1983, the prosecutor[9] suggested that the court treat two of the earlier guilty pleas as *Alford* pleas, thereby preserving her claims of innocence.[10] The sentencing judge did so. At the September 30 hearing on Myrick's new trial motion, defense counsel suggested, in effect, that the government's eagerness to convert Pounds' guilty pleas to *Alford* pleas was intended to cover up her perjury. Counsel therefore asked for an opportunity to present "independent evidence of [Pounds'] guilt in the two drug cases." After reviewing the pleadings and transcript of Pounds' sentencing hearing, the trial judge denied Myrick's new trial motion.

## II.

### A.

Appellant Hawthorne requested severance both in a written motion and in his pretrial argument.[11] He renewed this request at the close of Myrick's opening statement. Hawthorne contends on appeal that the trial court's denial of his motion was an abuse of discretion (1) because the evidence against his co-defendant, Myrick, was far more damaging than the evidence against him, *Sousa v. United States*, 400 A.2d 1036, 1041 (D.C.), *cert. denied*, 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979);[12] and (2) because, under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620,

20 L.Ed.2d 476 (1968), his confrontation rights were violated when Myrick's confession incriminated him.

■ Appellant's contentions fail. A defendant is entitled to severance on the basis of a disparity of evidence only when "the evidence of a defendant's complicity in the overall criminal venture is *de minimis* when compared to the evidence against his co-defendants." *Christian v. United States*, 394 A.2d 1, 21 (D.C.1978) (per curiam), *cert. denied*, 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979). This standard cannot be met because Hawthorne, in his own confession, admitted planning the felony and guiding Reed to the scene of the murder at gunpoint.

■ Hawthorne's *Bruton* argument also has no merit. The trial court redacted Myrick's statement to the police, implicating Hawthorne, for introduction into evidence before Myrick took the stand.[13] The court accordingly applied one of the alternative solutions to the *Bruton* problem announced by this court in *Carpenter v. United States*, 430 A.2d 496, 504 (D.C.) (en banc), *cert. denied*, 454 U.S. 852, 102 S.Ct. 295, 70 L.Ed.2d 143 (1981). Once Myrick elected to testify, the government substituted the unredacted version of Myrick's statement for use in cross-examination. No *Bruton* problem was presented because Hawthorne's co-defendant, in taking the stand, was available for cross-examination. *Nelson v. O'Neil*, 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971); *see Carpen-*

9. This was a different prosecutor from the one at appellants' trial.

10. In *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), the Supreme Court held that a valid guilty plea is not inconsistent with the defendant's claim of innocence where there is a strong factual basis for the plea.

11. Hawthorne's counsel also incorporated the arguments for severance made by Myrick's counsel.

12. The government argues in its brief that the denial of the motion for severance on this *de minimis* ground should be reviewed under a plain error standard because Hawthorne failed properly to renew his motion. We conclude that Hawthorne has failed to establish an abuse of discretion under any standard of review.

13. References to Hawthorne were deleted and changed to "another person" or "the other person." After Myrick's statement was read, the court instructed the jury that a voluntary confession was evidence only against the person who made it.

ter, 430 A.2d at 503.[14] The trial court, therefore, did not abuse its discretion in denying severance on this ground. *See id.* at 502–03.

### B.

▮▮▮ Hawthorne also contends the trial court improperly refused to permit him to refresh Catherine Pounds' recollection about her inability to describe him to the police. The court ruled that counsel could use the police notes only if the witness stated that they would refresh her recollection. Counsel, however, failed even to attempt to use the notes in this way; he merely asked Pounds whether she had given a detailed description to the police and did not challenge her affirmative answer.

Even assuming that Hawthorne preserved this issue for appeal, we perceive no abuse of the court's discretion in its ruling. *See United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 233, 60 S.Ct. 811, 849, 84 L.Ed. 150 (1940). The court's limitation on use of the police notes was proper under the law of this jurisdiction.[15] Furthermore, the statement which Hawthorne wished to use to impeach Pounds was admitted later as substantive evidence in the form of a stipulation.

### C.

Finally, Hawthorne contends the trial court erred in ruling that his confession was voluntary and thus in admitting the confession into evidence. The court credited Officer Norris' testimony that he fully apprised Hawthorne of his *Miranda*[16] rights, that Hawthorne confirmed he un-

derstood those rights, that he waived them in writing, and that, according to Norris' contemporaneously recorded report (admitted into evidence), Hawthorne had said he would only make an oral, not a written statement so that if he wanted to change his mind later he could say anything and thus pit the detective's word against his. We will not disturb the court's findings of fact on the issue of voluntariness where, as here, they have "substantial support in the evidence." *Bliss v. United States,* 445 A.2d 625, 631 (D.C.) (citation omitted), *modified on other grounds,* 452 A.2d 172 (1982), *cert. denied,* 459 U.S. 1117, 103 S.Ct. 756, 74 L.Ed.2d 972 (1983); *see United States v. Alexander,* 428 A.2d 42, 49–50 (D.C.1981); D.C.Code § 17–305(a) (1981).

▮▮▮ Independently, we must resolve the legal question whether Hawthorne's confession, under the totality of the circumstances, was voluntary. *Cf. Miller v. Fenton,* — U.S. —, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985) (ultimate issue of voluntariness is legal, not factual, question requiring independent federal determination of state court ruling). Although there is no evidence of Hawthorne's prior involvement with the criminal justice system, including experience with *Miranda* warnings, the foregoing facts concerning Hawthorne's waiver, plus the absence of any record evidence of trickery or coercion or of delay between arrest and confession, convince us that the trial court correctly ruled Hawthorne's confession was voluntary. *See Bliss,* 445 A.2d at 631. Indeed, as the trial court noted, in expressly electing to give an oral, not written, statement,

---

**14.** For this reason, the court did not, as Hawthorne contends, err in permitting use of the unredacted statement. Hawthorne's counsel declined the opportunity to cross-examine Myrick, and, at the completion of the government's cross-examination, which contained numerous references to Hawthorne, counsel for Hawthorne made no attempt to renew the opportunity.

**15.** FED.R.EVID. 612 provides in part that, while testifying, a witness may use "a writing to refresh his [or her] memory for the purposes of testifying." This rule reflects long-standing District of Columbia practice. *See Killeen v. United States,* 224 A.2d 302, 305 (D.C.1966). *See generally,* 3 Wigmore §§ 734–765 (Chadbourne Rev. 1970 & Supp.1985).

**16.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

"Hawthorne show[ed] a good deal of intelligence as to the decision he was making." [17]

### III.

Appellant Myrick contends, first, that the government's presentation of Leroy Farley as a witness resulted in the knowing use of perjured testimony, in violation of Myrick's due process right to a fair trial. Central to his argument is Farley's plea bargain, the implications of which, Myrick claims, were not made clear to the jury—to Myrick's prejudice.

### A.

Leroy Farley testified for the government as part of a bargain to plead guilty to an unrelated felony murder and to testify truthfully in this case, in exchange for the dismissal of charges against him in connection with Reed's murder, as well as in connection with the armed robbery of a market.

Basically, appellant contends the government entered into this plea bargain to induce testimony by Farley which the government knew would be false, then covered up the false testimony at trial, used it to argue the government's case to the jury, and even told the jury that, because of the plea agreement, Farley had no motive to lie.

In addressing these contentions, we must deal, preliminarily, with the general validity of plea bargains in exchange for testimony and with the government's obligation to disclose the terms of such an agreement to the jury.

■ A plea bargain, such as Farley's, to cooperate with the government in exchange for favorable treatment is "recognized as a proper exercise of [government] authority." *United States v. Librach*, 536 F.2d 1228, 1230 (8th Cir.), *cert. denied*, 429 U.S. 939, 97 S.Ct. 354, 50 L.Ed.2d 308 (1976). Testimony by an accomplice always carries some incentive to perjury. *See United States v. Dailey*, 759 F.2d 192, 198 (1st Cir.1985); *United States v. Iverson*, 205 U.S.App.D.C. 253, 258–59, 637 F.2d 799, 804–05 (1980), *modified*, 208 U.S.App.D.C. 364, 648 F.2d 737 (1981). But that risk is acceptable as long as the witness' agreement is not contingent upon the government's satisfaction with the content of the testimony. *See Librach*, 536 F.2d at 1230; *but see Dailey*, 759 F.2d at 196–99 (witnesses' plea agreement acceptable even though contingent, in vague terms, upon the "value" or "benefit" to the government of their cooperation). Farley's plea bargain was not such a contingent agreement.[18]

■ Because even a proper plea agreement may signal a witness' willingness to curry favor with the government by coloring the truth for the benefit of the prosecution, due process requires full disclosure of the terms of the agreement to the jury as an aid to evaluating the witness' credibility. *See Giglio v. United States*, 405 U.S. 150, 151–55, 92 S.Ct. 763, 764–66, 31 L.Ed.2d

---

17. Hawthorne also argues, for the first time on appeal, that he was denied his right to presentment without undue delay. Assuming that appellant has preserved this issue for appeal, we conclude that it is subsumed by the *Miranda* claim which we have considered and rejected. A waiver of *Miranda* rights includes a waiver of the right to presentment, without unnecessary delay, as to the same offense. *Pettyjohn v. United States*, 136 U.S.App.D.C. 69, 74, 419 F.2d 651, 656 (1969), *cert. denied*, 397 U.S. 1058, 90 S.Ct. 1383, 25 L.Ed.2d 676 (1970); *accord Woodson v. United States*, 488 A.2d 910, 914 n. 4 (D.C.1985); *Bliss v. United States*, 445 A.2d 625, 633, *modified on other grounds*, 452 A.2d 172 (1982); *cert. denied*, 459 U.S. 1117, 103 S.Ct. 756, 74 L.Ed.2d 972 (1983).

18. The terms of the agreement were established before Myrick's trial. The only uncertainty was that Farley had not yet been sentenced in the felony murder case in which he had pleaded guilty as part of his bargain with government. The jury was apprised of this in the prosecutor's rebuttal closing argument. (Farley had testified that no one had made any deal with him about his sentence, although he admitted that he hoped to get a more lenient sentence by testifying at Hawthorne's and Myrick's trial. This hope was illusory because the mandatory punishment for felony murder—deemed murder in the first degree—is life imprisonment. D.C. Code §§ 22-2401, -2404 (1981).)

104 (1972); *Napue v. Illinois,* 360 U.S. 264, 265–69, 79 S.Ct. 1173, 1175–77, 3 L.Ed.2d 1217 (1959); *McNeil v. United States,* 465 A.2d 807, 810 (D.C.1983); *DuBose v. Lefevre,* 619 F.2d 973, 978 (2d Cir.1980); *United States v. Barham,* 595 F.2d 231, 239–42 (5th Cir.1979); *United States v. Butler,* 567 F.2d 885, 887–90 (9th Cir.1978); *Boone v. Paderick,* 541 F.2d 447, 448–51 (4th Cir.1976), *cert. denied,* 430 U.S. 959, 97 S.Ct. 1610, 51 L.Ed.2d 811 (1977); *cf. Iverson,* 205 U.S.App.D.C. at 256–57, 637 F.2d at 802–04 (false statement of witness that she had already been sentenced); *United States v. Ramos Algarin,* 584 F.2d 562, 563–64 (1st Cir.1978) (witness received better treatment than agreed in plea bargain disclosed to jury).

■ After reviewing the record, we are satisfied the terms of Farley's plea agreement were disclosed to the jury. *See Butler,* 567 F.2d at 890–91 ("disclosure of the exact nature of the prosecution's dealing with its key witness" was necessary to allow the jury properly to weigh his testimony); *Librach,* 536 F.2d at 1230 (witness' plea agreement did not compromise fair trial where "the jury was fully apprised of the conditions under which [he] testified").

Both defense counsel were present at Farley's plea hearing, and they were aware that the terms of the plea agreement were the only consideration Farley received in exchange for testifying: otherwise "no payments, no favors, no special promise at sentencing." The trial judge who presided over this trial also presided over Farley's plea hearing and thus had knowledge and control of the terms of the plea bargain. The judge ruled that the plea agreement had to be fully disclosed to the jury.

Myrick's counsel, in his opening statement, prepared the jury to regard Farley as a witness who had admitted murder in a separate case and who had made "the deal of his life" in exchange for testifying against the appellants: "The government let him get away with [Reed's] murder." [19] The prosecutor then elicited the terms of the plea agreement in her direct examination of Farley.[20] Myrick's counsel extensively cross-examined Farley about the charges pending against him at the time he struck a plea bargain with the government—charges carrying a potential total sentence of from seventy-three years before parole to four life terms plus eleven years. Counsel also reminded the jury in closing argument about Farley's deal. The one element of contingency—the fact that Farley had not yet been sentenced—came to the jury's attention in the prosecutor's rebuttal argument. *See supra* note 18.[21] The jury, therefore, was in a position to evaluate Farley's credibility to the extent

---

19. Counsel told the jury that Farley had been charged in Reed's murder with all the counts that were being prosecuted against Myrick and Hawthorne. He also had been charged with felony murder "for shooting a liquor store owner five times" and was about to be charged with armed robbery of a food market. Farley pled guilty to the liquor store murder, and the market robbery charges were dropped. Counsel continued: "And do you know what else [the government] did? They dismissed this case against him and gave him a free ride on these charges.... The government let him get away with murder."

20. [Prosecutor:] Was it your understanding that you have an agreement with the government in return for your plea of guilty to felony murder while armed in connection with the shooting in a liquor store on 7th Street, that the government will not prosecute you for any other charges in that case, and the government will not charge you for an armed robbery of the Thai-Am restaurant, and that the government will not prosecute you for the felony murder in this case? Is that your understanding?
[Farley:] Yes, ma'am.

21. "Only by being apprised that [the witness] was still facing sentencing could the jury have a rational basis for deciding whether her persistent efforts to assign a share of the culpability to appellant were the product of a desire to tell the truth or an effort to ingratiate herself with the prosecutor, the sentencing judge, or both." *United States v. Iverson,* 205 U.S.App.D.C. 253, 258, 637 F.2d 799, 804 (1980), *modified,* 208 U.S.App.D.C. 364, 648 F.2d 737 (1981).

that the plea agreement may have had a bearing on it.[22]

**B.**

 Myrick contends, nonetheless, that this disclosure of the basic terms of Farley's plea agreement misses the point; under the circumstances, he says, the jury was not informed of the most crucial condition of that agreement: that Farley would give "truthful testimony"—a condition the government does not dispute.

We agree that, although the jury learned of all the considerations flowing back and forth under the plea agreement, it was not informed of this express warranty in addition to the warranty that any witness gives when sworn on oath to tell the truth. Accordingly, the jury was not in a position to consider the possibility, under the truthful-testimony clause, that if Farley were to deviate from the truth there might be consequences beyond the jury's crediting or discrediting his testimony—indeed, the possibility that Farley, too, could still be charged with Reed's murder.

But what could be the prejudice to Myrick from this particular nondisclosure? Suppose the government were to vouch for testimony it knew or strongly suspected was false by permitting it to stand uncorrected, by arguing its substance to the jury, and by stressing that Farley had no motive to lie because of the plea bargain. The government, as a result, would make effective use of that testimony whether it waived the truthful testimony requirement or exercised its option to revoke the bargain and prosecute Farley for Reed's murder. And yet, if the jury were told of the

truthful testimony requirement and the government did the same vouching, Farley's credibility more than likely would be enhanced, not diminished, unless the defense could substantially undermine his story.[23]

In short, any prejudice to Myrick would be derived from the government's knowing use of false testimony, not from the jury's ignorance of all the potential consequences to Farley if he violated his agreement, as well as his oath, to tell the truth.

What appellant really is concerned about, it would appear, is not that the jury failed to learn of the truthful testimony requirement of the plea bargain, *see supra* note 23, but that the government did not expect Farley to tell the truth in all respects—that there was, in effect, no truthful testimony requirement at all. That is the gravamen of Myrick's complaint, to which we now turn.

**C.**

 A prosecutor may not knowingly present false evidence or permit evidence, known to be false, to go uncorrected. *Giglio,* 405 U.S. at 153, 92 S.Ct. at 765; *Napue,* 360 U.S. at 269, 79 S.Ct. at 1177; *Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 341, 79 L.Ed. 791 (1935). Moreover, "[w]hen the 'reliability of a given witness may be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule." *Giglio,* 405 U.S. at 154, 92 S.Ct. at 766 (quoting *Napue* ). A defendant is accordingly entitled to a new trial if there is " 'any reasonable likelihood' " that false

---

**22.** *See United States v. Dailey,* 759 F.2d 192, 196 (1st Cir.1985) (to test the credibility of an accomplice-witness who has struck a plea agreement, it is necessary "that the jury be informed of the exact nature of the agreement, that defense counsel be permitted to cross-examine the accomplice about the agreement, and that the jury be specifically instructed to weigh the accomplice's testimony with care") (citations omitted). Regarding the final factor, we do not have the court's final instructions in the record on appeal, but neither appellant challenges those instructions.

**23.** Myrick's counsel was aware of the "truthful testimony" requirement, as the prosecutor referred to it extensively in a bench conference before Farley began to testify. During another bench conference in the midst of Farley's cross-examination, Myrick's counsel indicated he would not go out of his way to call the jury's attention to the "truthful testimony" requirement: *"I would rather not open up the subject, obviously."* [Emphasis added.]

testimony could " 'have affected the judgment of the jury.' " *Id.* (quoting *Napue*).

Myrick contends Farley lied on the stand in (1) minimizing his own and Thomas' roles in the crime (contrary to Myrick's own testimony) and in (2) denying that, while incarcerated pretrial, Farley had had a conversation with Johnny Butler,[24] Melvin Thomas' father (or father figure)—a conversation in which Butler purportedly had warned Farley, under threat, to protect Thomas. Myrick further asserts that the government knew these were lies, and that the failure to disclose the lies to the jury was prejudicial because their disclosure would have raised serious doubt about who killed Reed. In particular, disclosure would have enhanced Myrick's credibility in testifying that his own fear of Johnny Butler was the reason he initially had declined to tell the police about Thomas' involvement in Reed's murder.

■ Because no representative of the government was present at the crime and because all the government witnesses were impeachable in one way or another, the prosecutor did not have a concrete, reliable basis for disbelieving Farley's version of his own involvement; at most, she could believe, especially by reference to the plea bargain, that Farley was "an accomplice whether he admits it or not" (as she told the court during a bench conference). Accordingly, the prosecutor did not knowingly permit Farley to give false testimony about his own role.

■ In contrast, the prosecutor did anticipate that Farley might lie about the involvement of Thomas, who was to be prosecuted separately. Before Farley testified, therefore, she asked the court for permission, in effect, to impeach Farley by eliciting that, while incarcerated, he had had a conversation with Butler—information which Farley had told the prosecutor before trial. This would permit the jury to reach its own conclusion as to whether Farley was testifying under a threat. The court agreed. The prosecutor was thwarted, however, when, on direct examination, Farley denied he had had such a conversation and, on cross-examination, at most conceded he did not remember. The court forbade further exploration of the issue on rebuttal or otherwise.[25]

---

**24.** Johnny Butler was not related to Jacqueline Butler, the witness.

**25.** Before Farley took the stand, the prosecutor repeatedly asked the court for permission to impeach Farley: "We are asking the court as a representative of the government for permission to introduce evidence that might cause a jury to believe that Mr. Farley was biased on the question of Mr. Thomas." The court gave permission. On direct examination, however, Farley denied having had the conversation with Johnny Butler. On repeated questioning during cross-examination as to whether he had had the conversation with Johnny Butler, as well as a conversation with the prosecutor about Johnny Butler, Farley denied or said he "[didn't] know" or "[didn't] remember." Myrick's counsel pointedly asked Farley whether Johnny Butler had threatened him: "You don't remember talking to the prosecutor and saying that Johnny 'B' told you to lay off his friend or something?" At this point, the court sustained an objection on the ground that the question had exceeded the prosecutor's proffer regarding Farley's conversation with Johnny Butler—a proffer to elicit that the conversation had taken place but not its substance. Myrick's counsel, however, persist-

ed in effective cross-examination: he charged Farley with not remembering the conversations with Johnny Butler "about this case," and subsequently with the prosecutor, because drug use had destroyed his memory. The prosecutor asked for permission to lead Farley on redirect examination about the conversations, but the court refused on the ground that the prosecutor should have claimed surprise during direct examination.

At the end of the government's case in chief, Myrick's counsel asked that the prosecutor either testify (she refused) or stipulate (she agreed) as to her interview with Farley about the Johnny Butler conversation. The court initially agreed that one or the other would be necessary because "[i]t is an area of legitimate impeachment of the witness's testimony" and "[t]here is a need to perfect the impeachment." At this point, Hawthorne's counsel objected on the ground that, although evidence of the conversation with Johnny Butler might be proper impeachment of Farley, any exploration would bring to light a purported conspiracy among Hawthorne, Farley, and Thomas to kill Reed. Given the jury's natural difficulty in separating impeachment from substantive evidence, he said, his client would be hurt by the disclosure.

■ Farley's denial of his conversation with Johnny Butler was impugned by extensive cross-examination, *see supra* note 25, but never flatly contradicted. Thus, Farley's testimony about his own and Thomas' minor roles in the killing appeared more credible than it otherwise would have, since any unchecked lie is likely to enhance a witness' credibility. *See Napue,* 360 U.S. at 269, 79 S.Ct. at 1177; *Butler,* 567 F.2d at 890. Accordingly, there was a "presentation of known false evidence" that went uncorrected. *Giglio,* 405 U.S. at 153, 92 S.Ct. at 765; *see Napue,* 360 U.S. at 269, 79 S.Ct. at 1177.[26]

### D.

■ We therefore must determine whether Farley's false testimony "could ... in any reasonable likelihood have affected the judgment of the jury." *Giglio,* 405 U.S. at 154, 92 S.Ct. at 766; *Napue,* 360 U.S. at 271, 79 S.Ct. at 1178; *see United States v. Bagley,* —— U.S. ——, —— n. 9, 105 S.Ct. 3375, 3382 n. 9, 87 L.Ed.2d 481 (1985); *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976); *Butler v. United States,* 481 A.2d 431, 447 n. 30 (D.C.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1398, 84 L.Ed.2d 786 (1985); *McNeil,* 465 A.2d at 810.[27] In answering this question, we must consider the importance of Farley's testimony, the extent to which Farley's credibility was impeached, and the independent evidence of Myrick's guilt. *See Boone,* 541 F.2d at 451.

Myrick contends Farley's testimony was crucial for two reasons: (1) Farley gave the only testimony that Myrick pulled the trigger on Reed; and (2) the truth about Farley's conversation with Johnny Butler, which implicitly included a warning not to implicate Melvin Thomas, would have tended not only to undermine Farley's testimony about his and Thomas' roles but also to explain Myrick's similar reason for omitting any reference to Melvin Thomas in his own statement to the police. In short, evidence about the Butler conversation would have improved Myrick's credibility as a witness in presenting a version of the events at odds with Farley's.

Obviously, Farley was the key government witness against Myrick, but his testimony was by no means all the jury had to go on. Myrick himself admitted, in his statement to the police and at trial, that he was present at the killing of Reed. Two other witnesses—Catherine Pounds and Jacqueline Butler—testified between them that Myrick said something threatening about Reed on the day of the murder, that he was carrying a gun in his waistband, and that, after shots had been fired, Myrick, carrying "something black," ran out of the alley that Reed had entered minutes earlier. Nancy McIntyre, while not providing an identification, also heard shots and saw a man run out of the alley carrying something in his hand. Farley's eyewitness testimony, therefore, although critical, was supported by considerable circumstantial evidence linking Myrick to the murder. In short, Farley was the key government witness, although there was strong

---

Thus, Hawthorne's counsel refused to agree to a stipulation that the conversation took place. After listening to argument, the court—agreeing there was no foundation for admitting evidence of the Johnny Butler conversation for any purpose other than impeachment—ruled that this evidence would not be admitted, given "the tangential nature of that particular event" and "its collateral and speculative nature."

From the perspective of hindsight, it appears that one solution to the conflict presented when Hawthorne's counsel objected would have been to sever Hawthorne's trial at that point—a remedy which neither defense counsel requested.

**26.** We note that the nondisclosure of false testimony need not be willful on the part of the prosecutor to result in sanctions. *See Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).

**27.** This standard is stricter than the usual harmless error standard under *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946), *see Iverson,* 637 F.2d at 805 n. 20, but "equivalent to the *Chapman* [constitutional] harmless-error standard." *United States v. Bagley,* —— U.S. ——, —— n. 9, 105 S.Ct. 3375, 3382 n. 9, 87 L.Ed.2d 481 (1985).

independent, circumstantial evidence of Myrick's guilt.

As we evaluate the record, there is, on balance, a reasonable doubt that the government could have convicted Myrick without Farley's testimony (we do not mean to suggest that, absent Farley's testimony, the government could not have survived a motion for judgment of acquittal). Accordingly, we believe the question whether Farley's false testimony about the Butler conversation could have affected the judgment of the jury turns on whether Farley's credibility was sufficiently impeached to make the court's suppression of that falsehood harmless beyond a reasonable doubt. *See supra* note 27.

Defense counsel did manage, despite evidentiary restraints, *see supra* note 25, to convey to the jury that Farley—like Myrick himself [28]—was under a threat from Johnny Butler not to implicate Melvin Thomas. The prosecutor asked Farley whether he had had any conversation with Butler about the case. Farley answered, "No." On cross-examination by Myrick's counsel, Farley at first denied a conversation with Butler, as well as any discussion of such a conversation with the prosecutor. Soon thereafter, however, he said he "didn't know" or "didn't remember." *See supra* note 25. Then, Myrick's counsel made the connection for the jury: "According to you, Melvin was with you [i.e., not involved with the murder], and you were just saying [that] to help out Melvin because you are afraid of Johnny 'B.' Isn't that right?" In closing argument, Myrick's counsel repeated the point: "Do you want to see the impact, the influence of Melvin Thomas and his father, Johnny 'B,' on whether people will say things that aren't entirely true?

Right there. (Indicating [Farley]). In contradiction to all the other testimony in the case, from Mr. Myrick and from the government's own witnesses, Leroy Farley won't put Melvin's name in it." The prosecutor did not contradict this in her rebuttal argument. In short, the defense effectively planted a seed of doubt for the jury.

We also may consider the fact that Farley's credibility was successfully undermined in other ways. *See McNeil,* 465 A.2d at 811–12; *Ramos Algarin,* 584 F.2d at 566–67; *but see Napue,* 360 U.S. at 270, 79 S.Ct. at 1177. In the first place, the jury was aware by the time Farley was cross-examined that he had connections with Johnny Butler and his family, for Farley had testified that his girlfriend at the time of the murder was the sister of Johnny Butler's wife. From the plea bargain, moreover, the jury had reason to suspect that Leroy Farley himself was involved in the murder and that his testimony as to his own innocence was unreliable. Furthermore, Myrick's counsel extensively cross-examined Farley about the many charges outstanding against him which, absent the plea bargain, would have resulted in a total minimum sentence of 73 years. Finally, counsel forced Farley to admit that he was "willing to do just about anything to get some of that time back," including his testimony against Myrick. In closing argument, counsel reminded the jury of Farley's desperation: "He knew that he could get up there and say just about anything, as long as he pointed the finger across the table." Both defense counsel vigorously conveyed to the jury that Farley cooperated with the government because he, himself, was involved in Reed's murder.[29]

---

**28.** In his opening statement, defense counsel suggested that Melvin Thomas warned Myrick to "keep [Thomas'] name out of it"; as a result, Myrick did not mention Thomas in his statement to the police. On direct examination, defense counsel elicited from Myrick that he believed Melvin Thomas' threat because he "kn[e]w the connections that he had with his father [Johnny Butler]" and "[n]ot many people cross [Butler] and live." In closing argument, counsel reminded the jury of Melvin Thomas'

threat, implying it was a threat of retaliation and death.

**29.** In opening argument, Myrick's counsel said Farley got "the deal of his life" and "g[o]t away with [Reed's] murder" when he struck his plea bargain. Hawthorne's counsel artfully demonstrated, on cross-examination of Farley, that Farley's claim of innocence was inherently incredible, because otherwise he would have had nothing to gain by having the charges against

The jury accordingly had enough information to infer that Farley was motivated to testify against Myrick for at least two reasons: a connection with Melvin Thomas' family (if not a threat from Johnny Butler) and a plea agreement to do so. *See McNeil*, 465 A.2d at 812; *see also Barham*, 595 F.2d at 243 ("[Appellant] was entitled to a jury that, before deciding which story to credit, was truthfully apprised of any possible interest of *any* Government witness in testifying falsely" (emphasis in original)).

Defense counsel also impeached Farley, more generally, with his prior convictions, *see McNeil*, 465 A.2d at 811, which included felony murder and armed robbery convictions in December 1977 in addition to the felony murder to which Farley pleaded guilty as part of his bargain with the government. The court ruled that counsel could not present any details of Farley's previous crimes because this would suggest criminal propensity. Nevertheless, Hawthorne's counsel probed Farley about the felony murder to which he had pleaded guilty, suggesting that Farley "just walk[ed] in and sho[t] him [*i.e.*, the victim]." The court severely reprimanded counsel for doing this, but the information reached the jury.

Defense counsel also discredited Farley with his drug use. *See McNeil*, 465 A.2d at 811. Farley admitted he had used PCP as recently as a couple of days before the murder. Myrick testified that, on the day of the murder, Farley was smoking "lovely" (PCP). Defense counsel used this information to challenge Farley's ability to remember accurately, including his conversation with Johnny Butler and his subsequent interview with the prosecutor. Counsel argued in closing that Farley's memory was "so partial and so broken down" that he was an untrustworthy witness.[30]

We conclude that Myrick was successful, to a considerable degree, in impeaching Farley both as to bias against Myrick and as to credibility in general. *See McNeil*, 465 A.2d at 811 (extensive cross-examination of witness regarding "credibility in general as well as ... specific bias or motive" compensated for partial nondisclosure of plea bargain). The jury had sufficient information with which to weigh Farley's testimony against the conflicting testimony of other witnesses, including Myrick. *See Barham*, 595 F.2d at 238–39, 242–43. The failure to correct Farley's false testimony about the Johnny Butler conversation, therefore, could not, in any reasonable likelihood, have affected the judgment of the jury. The trial court's refusal, *see supra* note 25, to permit, let alone to require, disclosure—even though it was clear to the court and counsel that Farley had lied on the stand—was harmless beyond a reasonable doubt.

## IV.

Myrick also complains that misleading remarks in the prosecutor's closing argument tended to enhance Farley's credibility as a witness. The prosecutor argued that Farley's guilty plea to the liquor store felony murder should induce the jury to believe his testimony:

[A]s offensive [as] that is, that may be some reason why you should believe him, because when he said a month ago ...

him in Reed's murder dropped: "So all of this matter about you making a deal with the government ..., that was no deal for you, was it, because you didn't do anything anyhow?... You weren't guilty of anything. So you've—you really didn't have a deal for yourself. You just gratuitously entered a guilty plea in the other case. Is that a fair statement?" In closing argument, Hawthorne's counsel suggested it was Farley who pulled the trigger on Reed.

**30.** Another point on which the defense discredited Farley was his implausible testimony about the gun Hawthorne was carrying. Farley testified that he saw Hawthorne hold a gun to Reed, even though minutes before the crime Farley saw Hawthorne but did not notice the gun, which was a foot long and which Farley had lent to Hawthorne for several weeks without asking for it back, even though it cost Farley $100. Hawthorne's counsel extensively explored this matter on cross-examination.

when he came into this courtroom before this judge and said, "Sir, I am not going to trial: I pled guilty to murder; I killed somebody," I submit to you that has some bearing on your decisions about Leroy Farley, when he sat here and said, "I did not kill Mike Reed."

That case was dismissed before he testified. It was dismissed. It is over. So Leroy Farley could have come in here and said, "Okay, the truth is I did it," because nothing could have happened to him. It was already dismissed. It wasn't pending.

Myrick's counsel promptly objected to this statement.

■ We first address the government's assertion that the prosecutor's remark that "nothing could have happened to" Farley was accurate because Farley's plea bargain insulated him from prosecution for Reed's murder, despite his prevarication. There is some support for this position, *see White v. United States*, 425 A.2d 616, 618 (D.C.1980) ("the government must meet a standard of strict compliance with its [plea] agreement"); the government may not be in a position to revoke a plea agreement absent a witness' fraud in negotiating the agreement. *See United States v. Blackwell*, 224 U.S.App.D.C. 350, 363–64 & n. 18, 694 F.2d 1325, 1338–39 & n. 18 (1982). Given the complexity and uncertainty of the law in this area, we cannot say this remark of the prosecutor amounted to misconduct. In any event, the impact of this remark was dulled, if not conclusively rebutted, by the response of Myrick's counsel, in closing argument, that the government's assertion was "nonsense," that if Farley had confessed to Reed's murder on the stand "[t]hey would have revoked the plea offer," and that Farley was motivated throughout the trial to testify against Myrick. The prosecutor never challenged this response in her rebuttal. Indeed, her remark in rebuttal argument that Farley still faced sentencing for the unrelated felony murder tended to support defense counsel's comment that Farley had

a motive to testify against Myrick. (The jury was not aware that Farley's expressed hope for a lenient sentence was illusory. *See supra* note 18).

■ Very disturbing, however, is the prosecutor's insinuation that, because Farley had pleaded guilty to murder in a separate case, his testimony was to be trusted. In her argument quoted above, the prosecutor said, in effect, that Farley's assertions of his and Thomas' minor roles, and of Myrick's and Hawthorne's responsibility, were trustworthy, and yet minutes earlier, in a bench conference, the prosecutor had referred to Farley as "an accomplice."

The prosecutor had notified the court from the outset of the trial that the government was not "vouching for some portion of what Mr. Farley says." We have already discussed that the prosecutor, despite her own best efforts, was restrained by the court's evidentiary rulings from impeaching Farley as extensively as she wished. We therefore believe it was most inappropriate for the prosecutor to go out of her way to vouch for Farley's credibility, by reference to his plea bargain, when she knew—based on her own interview with Farley—that he had lied on the stand. The prosecutor had to know of this court's position that counsel may not properly argue that one who "pled guilty when he was guilty meant that he was innocent here." *(Duane) Dyson v. United States*, 450 A.2d 432, 440 (D.C.1982). This comes too close to expressing an opinion about the veracity of a witness—a forbidden tactic, even when counsel believes him, because it injects "'unsworn' and 'irrelevant' testimony." *(Phillip) Dyson v. United States*, 418 A.2d 127, 130 (D.C.1980); *accord Sherrod v. United States*, 478 A.2d 644, 657 (D.C. 1984); *Powell v. United States*, 455 A.2d 405, 408 (D.C.1982), *modified* (1983); *cf. United States v. Young*, — U.S. —, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (misconduct for prosecutor to express opinion that defendant was guilty). The prosecutor, as an officer of the court and "the attorney for

the sovereign," has a duty not only to prosecute vigorously, but also to serve the truth and to see that justice is done. *See Agurs*, 427 U.S. at 110–11, 96 S.Ct. at 2400–01. Judging by this standard, we conclude the prosecutor's comment in closing argument that the plea bargain "may be some reason why you should believe him" was, under the circumstances, improper.

■ Prosecutorial misconduct necessitates reversal, however, only when "the erroneous statements rose to the level of 'substantial prejudice.'" *McCowan v. United States*, 458 A.2d 1191, 1196 (D.C. 1983) (quoting *(Phillip) Dyson*, 418 A.2d at 132). For the reasons discussed above, the jury was fully informed of Farley's probable involvement in the murder and also learned of some protectiveness of Thomas. The jury was well equipped to judge Farley's truthfulness. We deem any impropriety here harmless.

## V.

■ Finally, Myrick asserts that the trial court abused its discretion when it denied his new trial motion based on newly discovered evidence that Catherine Pounds had perjured herself at trial. At the time she testified, Pounds had six cases pending against her. Although Pounds had use immunity regarding her testimony about drug-related matters, she testified that she had no other agreement with the government about the outcome of these cases. Under cross-examination, Pounds asserted she was not guilty of any of the charges outstanding against her and agreed with counsel's suggestion that they were "bad beefs." The focus of Myrick's new trial motion was that Pounds had perjured herself when she said she had no deal with the government, as well as when she said she was innocent of the outstanding charges, because she subsequently pleaded guilty to them.

We review the trial court's grant or denial of a new trial motion only for abuse of discretion. *Derrington v. United States*, 488 A.2d 1314, 1339 (D.C.1985). We will uphold the trial court's decision where it is based upon findings which are "reasonable and supported by the evidence in the record." *Id.* at 1339–40 (citations omitted); *see United States v. Johnson*, 327 U.S. 106, 111–13, 66 S.Ct. 464, 466–67, 90 L.Ed. 562 (1946).

We note, first, that there is no evidence Pounds had made an undisclosed deal with the government in addition to the use immunity known to the jury. Under some circumstances, moreover, a defendant may claim innocence while entering a valid guilty plea when the evidence of guilt is strong. *See Alford, supra* note 10.[31] Finally, the trial court's ruling was based in large part upon its observation that Pounds' credibility had already been substantially undermined at trial[32] and that the additional information would not have affected the outcome. *See Butler*, 481 A.2d at 446–47. We find substantial support in the record for this finding.

*Affirmed.*

---

**31.** The trial court surmised Pounds may have had the mistaken impression that, because no drugs or money had ever been found on her person, she could not be found guilty of the drug charges.

**32.** Myrick's counsel had impeached Pounds at trial with her police statement and grand jury testimony, neither of which contained a reference to Myrick's threat about the "out-of-towner" Reed. Counsel cross-examined Pounds about her outstanding charges suggesting that, even though she had no formal deal, "you expect that if you testify favorably for the government in this trial here, ... you will have a better chance for lenient treatment" and "being a star witness in a homicide case might help you in your own cases." This vigorous cross-examination supports the trial court's finding, in ruling on the new trial motion, that Pounds had been substantially impeached. *See Derrington v. United States*, 488 A.2d 1314, 1340 (D.C.1985).

At trial, the court had curtailed defense questioning on Pounds' unlitigated charges on the ground it was collateral. The court added that defense counsel had "plenty of fuel for argument to the jury right now." Indeed, in closing, defense counsel had argued that the jury would have to "swallow an elephant" to believe Pounds was not expecting a reward from the government for her testimony.

MACK, Associate Judge, dissenting in part:

In the circumstances of this case, I cannot agree that the prosecutor's closing argument, tending to enhance Farley's credibility as a witness, was harmless error as to Myrick. Farley was the sole eyewitness to testify for the government. He said he was an innocent bystander, that the murder was Myrick's idea and that he saw Myrick shoot Reed. Myrick's defense was that it was he who was an innocent bystander; it was Farley's plan and Farley shot Reed. The prosecutor's argument that the jury should believe Farley because he had no motive to lie, combined with the jury's understanding that the charges against Farley had been dropped, Farley's maintaining of his innocence, and the inability to impeach Farley with respect to a relevant matter about which counsel knew he was lying, obviously bolstered Farley's credibility and diminished Myrick's. It is unavoidable, and the jury understands, that prosecutors at times must rely upon the testimony of less-than-savory characters but the jury should not be told that the testimony bears the government's stamp of approval. I would reverse as to Myrick.