**Phillip C. WILLIAMS, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 95–CF–1742.**

District of Columbia Court of Appeals.

Argued Dec. 2, 1999.
Decided Aug. 10, 2000.

Enid Hinkes, appointed by the court, for appellant.

Barton S. Aronson, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Elizabeth Trosman, and William D. Weinreb, Assistant United States Attorneys, were on the brief, for appellee.

Julie Brain, Public Defender Service, with whom James Klein and Jaclyn Frankfurt, Public Defender Service, were on the brief, for the Public Defender Service as amicus curiae.

Before TERRY, FARRELL, and WASHINGTON, Associate Judges.

TERRY, Associate Judge:

A grand jury indicted appellant on one count of distribution of cocaine and one count of possession of cocaine with intent to distribute it, in violation of D.C.Code § 33–541(a)(1) (1998). After the grand jury was empaneled, but before it considered appellant's case, a Metropolitan Police Department ("MPD") detective came before the grand jury in the course of its

orientation. Although he was not sworn as a witness, the detective provided the grand jury members with background information about various drug-related matters in the District of Columbia, including the packaging and identification of narcotics. Prior to trial, appellant filed a motion to dismiss the indictment on the ground that any presentation to the grand jury of narcotics-related information contaminated the grand jury and fatally tainted the indictment. The trial court denied the motion and also denied appellant's request for transcripts of the grand jury orientation proceedings. The government later dismissed the charge of possession with intent to distribute, and the case went to trial on the remaining charge of distribution. Appellant was found guilty as charged and was later sentenced to a term of imprisonment.

Appellant's primary contention on appeal is that the trial court erred in denying his motion to dismiss the indictment because the detective's presentation to the grand jury violated both Super. Ct.Crim. R. 6 and the statutory prohibition on unsworn testimony. In addition, appellant argues that the Jencks Act, 18 U.S.C. § 3500 (1994), required the government to turn over the tape recording of the grand jury orientation and that the trial court erred in denying his motion to suppress identification testimony. We affirm.

### I

#### A. *Proceedings before the Grand Jury*

After the grand jury that indicted appellant was sworn, an MPD detective knowledgeable about narcotics-related activities in the District of Columbia made an appearance before the grand jury as part of its orientation. Before the grand jury

heard evidence about any specific case, the detective gave the grand jury some general background information about drug trafficking, including the packaging and identification of narcotics.[1] The detective was not sworn, and no one was present except the detective and the grand jurors. In addition, although the detective's session with the grand jury was recorded on tape, it was not transcribed.

Appellant filed a pre-trial motion to dismiss the indictment, arguing that this presentation contaminated the grand jury and that the detective was not under oath as required of all grand jury witnesses. The court denied the motion, saying, "If what you're referring to is what I think you're referring to, that is, the orientation of the grand jury prior to them hearing specific cases, then I don't see any violation of Rule 6...." In addition, the court denied appellant's request for a transcript of the detective's presentation.

#### B. *The Motion to Suppress*

Appellant also filed a motion to suppress identification, arguing that his identification was the product of an illegal arrest. The only witness at the hearing on the motion was Collis Timlick, an undercover police officer who participated in the purchase of drugs from appellant. Timlick testified that he and Officer Michelle Green initially approached appellant in the 4100 block of Georgia Avenue, N.W. After they engaged him in "a brief conversation about buying some coke," appellant walked across Georgia Avenue and spoke to Victor Rogers, who was waiting there.[2] From across the street, Officer Timlick saw Rogers hand appellant "something in the form of a small object." Appellant then walked back to where the officers were standing and handed the object—a ziplock bag "con-

---

1. The identity of the detective who appeared before the grand jury is unknown. At trial, Detective Myron Smith, the government's drug expert, testified that he was regularly involved in grand jury orientation but did not believe that he appeared before the grand jury that heard appellant's case.

2. Although Rogers and appellant were indicted as co-defendants, appellant was tried alone. The record does not disclose what happened to the case against Rogers.

taining a white rock substance"—to Officer Timlick, who in return gave appellant $20 in pre-recorded funds.

After a field test showed that the rock-like substance was cocaine, Officer Green broadcast a lookout, including descriptions of both men, to an arrest team waiting nearby. About forty-five seconds later, Officer Timlick, now traveling along Georgia Avenue in an unmarked police car, saw appellant, Rogers, and several other individuals standing together on a corner, where they had been stopped by members of the arrest team. Timlick testified that he passed within eight to ten feet of the group and identified appellant "by his face and what he was wearing."

Following the testimony, defense counsel argued that the government had not put on any evidence showing why the officer who arrested appellant had stopped him. Counsel noted that "the government for whatever reason did not want to put on the officer who made the stop." Notwithstanding this argument, the court denied the motion to suppress, saying:

> I believe that there is an inference the court can draw, which is that the officer who stopped Mr. Williams was aware that he had just engaged in an apparent drug transaction, because we know that he was stopped by members of the arrest team, that is what the officer testified to. And the officer testified that he broadcast a lookout, or that Michelle Green broadcast a lookout of the defendant, saying these are the people we just brought the drugs from, here is their description.
>
> It is certainly a fair inference that the officer who arrested him knew and heard the lookout. It happened 45 seconds later by members of the arrest team. They had just radioed over the radio. Unless the officer was not paying

attention but just drove down the street and [saw] Mr. Williams randomly, which is not a reasonable inference, then there was probable cause for his arrest. And the reason there was probable cause was known to the officers who seized him.

## C. The Trial

At trial Officer Green testified that she was in the 4100 block of Georgia Avenue, along with Officer Timlick, to make an undercover narcotics purchase. Both officers approached appellant, and Green "asked him did anyone have coke, meaning cocaine." Appellant replied, "Wait right here," and walked across the street to Victor Rogers. From across the street Officer Green saw Rogers hand a small object to appellant, who then returned and handed the object to Officer Timlick in exchange for $20 in pre-recorded funds.

After making the sale, the officers returned to their car, and Officer Green "wrote down the lookout on a buy report, the description of the clothing that the two individuals were wearing, and then broadcast the lookout on the radio to the arrest team."[3] Green testified that approximately three to five minutes later she saw appellant and Mr. Rogers lined up on Georgia Avenue along with a number of other individuals. The officers drove past, and Officer Green identified appellant to the members of the arrest team. Green's testimony was corroborated both by Officer Timlick[4] and by two members of the arrest team, Officer Demetricia Carter and Detective David Stroud.

Finally, Detective Myron Smith testified as an expert in the distribution and use of narcotics, particularly crack cocaine. As a preliminary matter, Detective Smith said that he was not involved in the investigation or arrest of appellant, nor did he have any firsthand knowledge about the facts of

3. Officer Cassandra Adams testified that while she was performing the field test which confirmed the substance to be cocaine, Officers Green and Timlick were broadcasting the lookout.

4. Officer Timlick's trial testimony was essentially the same as that given at the suppression hearing.

the case. He then testified about the procedures used by the MPD and the Drug Enforcement Agency to safeguard and analyze evidence, and about the common practice among drug dealers not to have drugs or money on their persons while they engage in drug trafficking.

On cross-examination, defense counsel asked whether Detective Smith had given any presentation to the grand jury which heard appellant's case. At this point, the prosecutor objected on relevance grounds, and a bench conference followed. Defense counsel argued that if Detective Smith had given the presentation to the grand jury, his testimony would be producible under the Jencks Act. The court responded that it was "sure" that Smith did not give a presentation in this particular case, but decided to question the witness directly:

> THE COURT: Did you testify in the grand jury in connection with this case?
>
> THE WITNESS: Not as a fact witness, I don't believe so, no.
>
> THE COURT: Not as a fact witness, but you—but you may have testified in the grand jury in connection with this case?
>
> THE WITNESS: Not—it's not considered testimony. What it is, a grand jury presentation where we acquaint—
>
> THE COURT: Well, what do you do exactly?
>
> THE WITNESS: Just show them the different drug trends, packaging, narcotic identification, what different substances are, and normally that's done about the first or second day of their grand jury stay.
>
> THE COURT: And so if it had been on the day evidence was presented in this case, you wouldn't have talked about this case?
>
> THE WITNESS: I would not have talked about this case whatsoever because I wouldn't have any knowledge of the case.

After the court heard this testimony, there was no further discussion of the Jencks Act, and counsel's questioning of Detective Smith moved to other matters.

The defense called one witness, Charles Taitano, who testified that he met appellant as he was coming out of his house. According to Mr. Taitano, the two of them had plans to watch a boxing match at a friend's house. However, as they were walking down the street, the police "jumped out and searched [appellant]."

## II

### A. *The Grand Jury Orientation*

Appellant's primary argument is that the trial court erred in refusing to grant his motion to dismiss the indictment. He contends that the unknown detective's narcotics orientation lecture was testimony by a witness, and that a witness must be sworn or the grand jury has been tainted. The government responds that appellant cannot challenge a facially valid indictment on these grounds, and that he is, in any event, wrong in asserting that the detective's presentation violated any rule governing grand jury proceedings. While we agree with appellant that the detective who appeared before the grand jury should have been under oath, as required by statute, we conclude that any error was harmless.

■ It is well established that the grand jury's responsibilities "include both the determination whether there is probable cause to believe a crime has been committed and the protection of citizens against unfounded criminal prosecutions.... The grand jury may compel the production of evidence or the testimony of witnesses as it considers appropriate, and its operation generally is unrestrained by the technical procedural and evidentiary rules governing the conduct of criminal trials." *United States v. Calandra*, 414 U.S. 338, 343, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) (citation omitted). Nevertheless, any witness who appears before the grand jury must first swear an oath. The oath requirement is established in this jurisdiction by

D.C.Code § 14–101(a) (1995), which states: "All evidence shall be given under oath according to the forms of the common law." By assuring that anyone who gives evidence against another may be held accountable for his or her statements, it discourages false or unreliable testimony.

■ In the present case, the anonymous detective provided information to the grand jury about the behavior of typical narcotics users and sellers. We readily hold that such information was "evidence" as that term is used in section 14–101(a). The fact that he was not testifying about the events that occurred in appellant's individual case did not exempt him from the requirement of an oath. Moreover, the detective's presentation gave the grand jurors background details that formed an important part of the evidence in the cases that they went on to consider. For these reasons any defendant is entitled to insist that all information presented to the grand jury be provided only by witnesses who are under the solemnity of an oath. *See In re Sippy*, 97 A.2d 455, 458 (D.C.1953) ("the requirement that evidence shall be under oath is not limited to any particular proceeding").

■ Nevertheless, it does not follow that the indictment in the instant case should have been dismissed. In *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988), the Supreme Court held, "as a general matter," that a federal court "may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." We agree with this standard and adopt it for the District of Columbia courts as well. Following *Bank of Nova Scotia*, we hold in this case that although it was a violation of section 14–101(a) for the government to present unsworn testimony to the grand jury, dismissal of the indictment was not required because there is nothing in the record to indicate that the violation had any substantial influence on the grand jury's decision to indict.

The Court in *Bank of Nova Scotia* distinguished two classes of cases in which a court is asked to dismiss an indictment. The first class, which is very limited, consists of those cases in which "the errors are deemed fundamental," *id.* at 256, 108 S.Ct. 2369—that is, cases "in which the structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair, allowing the presumption of prejudice." *Id.* at 257, 108 S.Ct. 2369 (citation omitted). In such a case, an error of constitutional magnitude has occurred, and any remedy short of dismissing the indictment would be inadequate. The two specific cases within this category cited by the Court involved racial or gender discrimination in the selection of the grand jury. *See Vasquez v. Hillery*, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (racial discrimination in selection of grand jury); *Ballard v. United States*, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946) (women excluded from jury pool). The second and larger class includes those cases in which dismissal is sought for other violations which do not give rise to a presumption of prejudice. In such a case, a court must conduct a harmless-error inquiry, applying a special standard for determining prejudice:

> Under this standard, dismissal of the indictment is appropriate only "if it is established that the violation substantially influenced the grand jury's decision to indict," or if there is "grave doubt" that the decision to indict was free from the substantial influence of such violations.

*Bank of Nova Scotia*, 487 U.S. at 256, 108 S.Ct. 2369 (citing *United States v. Mechanik*, 475 U.S. 66, 78, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986) (O'Connor, J., concurring)).

The errors alleged in *Bank of Nova Scotia* involved violations by the prosecutor of Fed.R.Crim.P. 6, a witness immunity statute, and constitutional provisions governing grand jury proceedings, as well as

matters of general practice which affected the quality and reliability of the evidence presented. In reviewing the district court's findings of prosecutorial misconduct, the Court concluded that none of the violations warranted dismissal of the indictment. 487 U.S. at 260–262, 108 S.Ct. 2369. The Court held that "those violations that did occur do not, even when considered cumulatively, raise a substantial question, much less a grave doubt, as to whether they had a substantial effect on the grand jury's decision to charge." *Id.* at 263, 108 S.Ct. 2369. In future cases, the Court declared, "[e]rrors of the kind alleged in these cases can be remedied by means other than dismissal"—for example, a contempt citation, disciplinary proceedings, or simply chastising a prosecutor in a published opinion. "Such remedies allow the court to focus on the culpable individual rather than granting a windfall to the unprejudiced defendant." *Id.*

■ The present case, like *Bank of Nova Scotia,* does not involve any fundamental error that would undermine the structural protections of the grand jury. The suggestion that presentation of narcotic-related information, not specific to any case that will come before the grand jury, so seriously undermines structural protections as to warrant automatic dismissal of the indictment finds no support in the case law. To the contrary, the cases cited by the Supreme Court in *Bank of Nova Scotia* as requiring automatic dismissal were cases which involved racial and gender discrimination in the selection of the grand jury—fundamental errors of

"constitutional magnitude" affecting the grand jury's composition. *See* 487 U.S. at 257, 108 S.Ct. 2369. Here, however, the conduct at issue was simply an ill-conceived procedure adopted by the United States Attorney's Office which has since been discontinued.[5] It does not, in our view, rise to the level of "prosecutorial misconduct ... so systematic and pervasive as to raise a substantial and serious question about the fundamental fairness of the process which resulted in the indictment." *Id.* at 259, 108 S.Ct. 2369.

The virtually uncontradicted testimony at trial established that the police asked for, and received, cocaine from appellant in exchange for money. In these circumstances we think it most reasonable to conclude that the grand jury's decision to indict was not substantially influenced by the general information provided by the anonymous detective, nor is there even "grave doubt" on the subject. We find no rational basis for a claim of prejudice and accordingly hold that any error in the proceedings before the grand jury was harmless. *Bank of Nova Scotia,* 487 U.S. at 257, 108 S.Ct. 2369; *Mechanik,* 475 U.S. at 78, 106 S.Ct. 938 (O'Connor, J., concurring);[6] *see Chambers v. United States,* 564 A.2d 26, 29 (D.C.1989) (appellants "cannot demonstrate any meaningful prejudice [resulting from the grand jury proceedings], which is a prerequisite to reversal of their convictions").

### B. *The Jencks Act Issue*

■■ Appellant also contends that the Jencks Act, 18 U.S.C. § 3500, required the

---

5. Counsel for the government represented to us at oral argument that his office no longer calls upon a police drug expert to appear during the grand jury orientation process.

6. The majority opinion in *Mechanik* approved the trial court's focus on the outcome of the trial rather than on what happened before the grand jury:

> [T]he petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict,

then, any error in the grand jury proceedings connected with the charging decision was harmless beyond a reasonable doubt. 475 U.S. at 70, 106 S.Ct. 938 (footnote omitted). This reasoning is also applicable to the present case. Indeed, as the Public Defender Service acknowledges in its *amicus* brief, the testimony that the anonymous expert gave before the grand jury presumably "cover[ed] the identical subject matter" as the testimony that Detective Smith gave at trial, which was subject to cross-examination and full evaluation by the petit jury.

government to turn over the tape recording of the detective's presentation to the grand jury. The purpose of the Jencks Act is "to aid in the search for truth by permitting access to prior statements of government witnesses for possible impeachment." *Fields v. United States,* 368 A.2d 537, 539 (D.C.1977) (citation omitted); *see Slye v. United States,* 602 A.2d 135, 138 (D.C.1992). "The Act entitles defendants to statements of a testifying witness, possessed by the government, that relate to the subject matter on which the witnesses testified." *Bayer v. United States,* 651 A.2d 308, 311 (D.C.1994). Once a defendant requests production of reports or statements under the Jencks Act, therefore, the trial judge "has an affirmative duty ... to ascertain whether the statement is one defined by the Act itself as producible material and whether it is in the possession of the government." *Colbert v. United States,* 471 A.2d 258, 262 (D.C.1984); *see March v. United States* 362 A.2d 691, 706 n. 9 (D.C.1976).

■ In this case the tape recording of the anonymous detective's presentation to the grand jury does not fall within the purview of the Jencks Act. There has been no showing whatsoever that Detective Smith was in fact the drug expert who appeared before the grand jury that indicted appellant. Smith testified at trial that he had no firsthand knowledge of appellant's case and did not recall having made a presentation to this particular grand jury. There was no evidence, or even a proffer, to the contrary. Since a "statement," within the meaning of the Jencks Act, is the written or recorded statement of "any witness called by the United States" who actually testifies at trial, *see* 18 U.S.C. § 3500(e), and since it was not shown that Detective Smith (or any other trial witness) was the person who appeared before the grand jury, we hold that appellant failed to establish that the tape recording was a "statement" producible under the Jencks Act.[7]

■ There being no other basis for reversal,[8] appellant's conviction is

*Affirmed.*

---

7. No contention is made that the tape recording might have been producible or discoverable on some other ground.

8. Appellant also contends that the trial court should have suppressed his identification on the ground that the government failed to establish probable cause for his arrest. This argument is entirely without merit. The testimony which the court credited at the suppression hearing established that the undercover officers paid appellant $20 for a ziplock bag containing crack cocaine. Following the sale, the officers broadcast a lookout to the arrest team which included a particularized description of the drug seller's clothing and his location. Less than a minute later, appellant was detained by the arrest team, and Officer Timlick positively identified appellant to the arrest team as he drove past in an automobile. The fact that no members of the arrest team actually testified that they relied on the lookout in making the arrest is inconsequential. *See Hill v. United States,* 627 A.2d 975, 979 (D.C.1993) (citing cases).