Perry WOODALL, Appellant,

v.

UNITED STATES, Appellee.

No. 99–CO–1653.

District of Columbia Court of Appeals.

Argued Nov. 24, 2003.

Decided Feb. 26, 2004.

Timothy P. O'Toole, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Chrisellen R. Kolb, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher and Roy W. McLeese III, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL, RUIZ, and GLICKMAN, Associate Judges.

FARRELL, Associate Judge:

Appellant was found guilty by a jury of felony murder while armed and related offenses arising from the shooting death of Samuel Yun during an attempted robbery of Mr. Yun at his liquor store in Northeast Washington, D.C. Appellant's principal argument on appeal is that the trial court committed constitutional error by refusing to allow defense-proposed measures to be taken to correct testimony by a government witness which the prosecutor admitted at trial had been false. We hold, considering all of the circumstances, that the course chosen by the court to correct the false testimony—permitting cross-examination of a police detective which contradicted the witness's testimony on the points—was sufficient to neutralize the falsehoods, and that there is no reasonable possibility that the jury's verdict rested on the court's failure to take additional corrective measures. *See United States v. Bagley,* 473 U.S. 667, 678–79 & n. 9, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (citing *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). Because we reject as well appellant's other arguments for reversal, we affirm the judgments of conviction except for the necessary vacatur of convictions for lesser-included or supernumerary offenses.[1]

## I.

At mid-morning on August 3, 1998, Chong Yun, the co-owner of a liquor store at 1806 D Street, N.E., was tending to the business while her husband Samuel went to the bank. A woman later identified as Lorraine Jackson entered the store and bought a 12–pack of Corona beer, asking Mrs. Yun to hand her the beer by opening the door of the plexiglass cage inside which Mrs. Yun was working. Mrs. Yun instead slid the beer through the counter turntable, and Ms. Jackson left the store carrying it. But she returned moments later and asked to buy a "bumper" case of larger beer bottles. Mrs. Yun refused to sell her the beer, in part because doing so would have required her to open the door of the plexiglass cage. Ms. Jackson left the store a second time.

Samuel Yun returned from the bank a short time later, at which point Ms. Jackson reentered the store and purchased the bumper case of beer from him. He opened the cage door so she could retrieve the case, but after leaving the store once again, Ms. Jackson returned and asked Mr. Yun to carry the case for her to a store next door. He agreed. Mrs. Yun did not see her husband reenter the store, but was alerted to the fact that he had done so when she heard a "banging" noise that caused her to look up from the lottery machine she was operating. She moved

---

1. The government concedes that one of appellant's felony murder convictions, his conviction for the felony underlying the remaining felony murder conviction, his second-degree murder conviction, and the corresponding convictions for possession of a firearm during a crime of violence or a dangerous crime must be vacated. We agree; the parties may take the proper steps to effect that result on remand.

toward the cash register and saw a large man holding Mr. Yun down. The assailant was "a little heavy set" and "fatter than the average person," and wore a "light gray sweatshirt" with "[s]ome kind of hood ... cover[ing his] entire head." He had a gun in his hand. Although Mrs. Yun could not see his face, she heard him tell Mr. Yun, "Open the door, open the door!" As Mrs. Yun fumbled to open the cage door she heard a gunshot. Mr. Yun had been shot in the head with a handgun; he subsequently died from the wound. Mrs. Yun could not identify appellant as the shooter from an array of photographs, but identified Ms. Jackson from an array as the woman who had attempted to buy beer, and appellant from another array as a person who had robbed the store four or five years earlier and had been barred from the store as a result.[2]

Other witnesses tied appellant directly or circumstantially to the shooting. Herbert Russell, a forty-one year old resident of the neighborhood who had known appellant since appellant was in elementary school, saw him riding his bicycle near the Yuns' liquor store at around 8:30 on the morning of August 3. As the two exchanged greetings, Russell noticed that despite the hot weather that morning appellant wore a gray "hoodie, sweat pants, tennis shoes" and "cotton gloves." Russell left the scene but returned an hour later to cash a check at the liquor store. Approaching the store, he saw appellant standing near a public telephone talking with Ms. Jackson, whom Russell also knew. Russell cashed the check and left the scene again, but returned at about 10:00 a.m. to buy snacks and money orders. When he was two feet from the door of the liquor store, he heard an argument

inside during which Mr. Yun said "don't do that, don't do that" and appellant—whose voice Russell recognized—responded "shut up, shut up." Russell then heard a gunshot and began running away. As he did so he turned around and saw Ms. Jackson run out of the store yelling "help, help, help," followed by appellant who was still clad in "sweat pants[,] tennis shoes, the hoody," and gloves.

Valdez Hall had approached the liquor store at about 9:55 a.m. on August 3 to play the lottery. Nearby he saw "someone riding a bicycle, [who] had on a coat, a hood, glasses and gloves," a sight that made Hall uneasy because "it didn't make ... sense ... when it's 90 something degrees ... [to wear] all those clothes." Hall recognized Ms. Jackson as she tried to buy beer in the manner described by Mrs. Yun; Jackson would periodically leave the store and talk with appellant, whom Hall also recognized from the neighborhood.[3] Minutes later Hall saw appellant "standing in front of the store on the bike," and as Hall walked away from the store he heard the bike fall over and saw appellant entering the store. He heard a gunshot, and then saw appellant "running by," his hood down and sunglasses gone. At trial Hall was impeached with his successive failures to select appellant's photograph from arrays; he claimed he had been too frightened to do so, but that eventually he had identified appellant as the shooter after being made to "feel more secure" by a police detective.

Other neighborhood residents furnished corroborative testimony. Hazel Evans, although unable to identify appellant, recalled seeing a "thick[ly]" built man in a

---

2. The trial court instructed the jury that "Mr. Yun's reasons for excluding Mr. Woodall from the store are of no concern to you."

3. Hall had seen appellant in the neighborhood and had been told that his name was "Perry."

"gray sweat-shirt and hood" standing by a phone booth near the liquor store that morning; he was looking around the corner and appeared to be putting on gloves. Soon afterward, Evans heard a gunshot and saw the man in the gray sweatshirt leave the liquor store and walk around the corner. Rudolph Lindsey had approached the liquor store at around 8:30 a.m. to use the phone booth outside. He saw a bicycle "leaning on the phone" with a "towel wrapped around it"; a man who appeared to be the owner of the bike was using the phone and wore "a sweatshirt with a hood on it pulled tight." Unable to use the phone, Lindsey left and returned a few minutes later to see the hooded man still at the phone booth, although seemingly not talking on the phone.[4]

In a post-arrest statement to the police, appellant admitted that "he had been riding his bike" on the day of the murder, and, when shown a photograph of the bicycle recovered from the scene, conceded that it "was his bike but it didn't have all that stuff," including the towel wrapped around it. He further acknowledged having used the pay phone near the liquor store that morning, but insisted that he had been at the home of his girl friend, Gina King, at the time of the shooting.

## II.

In addition to his alibi defense (elicited only through portions of his statement to the police), appellant defended on the theory that Lorraine Jackson's son, Anthony Shank, had in fact been the person who tried to rob Mr. Yun and shot him. Appellant's principal argument on appeal arises from answers given by the government's witness Herbert Russell on cross-examination that was designed to establish that Russell was afraid of Anthony Shank, and so had falsely named appellant as the assailant instead. Appellant argues that Russell gave perjured answers to questions about his fear of Shank, and that the prosecutor, while conceding the falsity of the answers, combined with the trial court to leave uncorrected before the jury the false impression the answers created. We set forth the relevant facts and then discuss them in light of the governing legal principles.

## A.

Through cross-examination of Russell and testimony of a defense investigator, appellant sought to establish that Russell knew the real identity of Mr. Yun's shooter but had shifted the blame to appellant out of fear of Shank. Thus, Russell was asked whether: he had related to the defense investigator that he had named Shank as the shooter to his cousin, Earl Hoes; he had told the grand jury he had seen an unidentified man leave the store after the shooting along with Ms. Jackson's niece; and he had similarly told the investigator of seeing a man with "really dark skin"— the color of Shank's skin—follow appellant out of the liquor store. Appellant's counsel then asked Russell if he believed Shank had shot another man named "Blue" on a separate occasion. When Russell answered no, counsel asked him if he had not told police Detective Hamann in an earlier interview that Shank had shot Blue and that "Shank and those guys were ... armed to the teeth." Russell denied that

---

4. William Nam, owner of a food mart next to the Yuns' store, had seen appellant in his store several weeks before the shooting and had overheard him say to other customers, "[T]here's a mother fucker. I just want to kill Sam." Appellant seemed angry and to be "making complaints and calling [Sam] names," although Nam regarded the threats as "jok[ing]."

he had told Hamann either fact, and denied that he was afraid of Shank.

When cross-examination of Russell was finished, the prosecutor told the court out of the jury's presence that Russell had been surprised by the questions about the shooting of Blue and was, the prosecutor believed, "extremely fearful," because "Shank is dangerous and so are the other gentlemen who deal drugs and shoot each other down there ... at 18th and D." Having just consulted with Detective Hamann, the prosecutor stated that Russell's statements to Hamann linking Shank to the shooting of Blue had been "provided [to the detective] in confidence" as part of an unrelated investigation. Although the prosecutor asked to have the questioning about the shooting of Blue stricken from the record as irrelevant, the trial court ruled that the questions were permissible as going to Russell's possible fear of Shank and his motive to deflect blame from him.

Detective Hamann was later called by the government to testify about witness identifications. On cross-examination, appellant's counsel turned to the previous interview Hamann had had with Russell and asked if Russell had not told him that Shank "shot Blue sometime ago in the area of 18th and D." The prosecutor renewed his objection to this line of questioning, explaining again that Russell had denied making the statements to Hamann out of "fear for safety"—that, indeed, Russell had been "instructed a prior time by someone other than me to do that publicly." The court repeated its conclusion that evidence of Russell's fear of Shank was relevant to his possible motive to falsify, and the questioning continued:

Q: Detective, Mr. Russell told you that Shank shot Blue ... right?

A: Yes, he said something about Shank shooting Blue.

Q: He indicated that Shank shot a guy in the jaw, right?

A: Yes.

Q: And he told you that Shank was, quote, armed to the teeth?

A: He said that the guys at 18th and D were armed to the teeth because there was a shooting war going back and forth between them and some guys from Independence. But ... we already knew that and this is all hearsay.

Q: What Mr. Russell told you, sir, is that Shank was one of the guys at 18th & D right?

A: Yes.

Q: Is it fair to say that Mr. Russell indicated to you that he was afraid of Shank?

A: He didn't say that he was afraid of him, but he was very cautious.

Q: Is it fair to say that he indicated that Mr. Shank was dangerous?

A: I think you could take that from what he said.

At the close of the evidence, appellant moved to admit as an admission of a party opponent the prosecutor's "representations that [Mr.] Russell's testimony about not saying anything to Detective Hamann about Shank were false." The prosecutor objected, although acknowledging once more that Russell's denial that he had told Hamann of Shank's role in the shooting was untruthful. The court denied the request because, in its view, Hamann's testimony on cross-examination had been sufficient to counteract Russell's falsehood.[5]

---

5. The court did not expressly rule whether the prosecutor's representations met the test for an admission by a party-opponent and so were not hearsay. *See Harris v. United States,*

834 A.2d 106, 115–18 (D.C.2003). Assuming, without deciding, that they did and that they were admissible in their own right—*i.e.,* independently of the constitutional necessity for

For the same reason, the court denied a defense request for the jury to be given a version of the standard instruction concerning testimony of an admitted or convicted perjurer.

## B.

▮ "A prosecutor may not knowingly ... permit evidence, known to be false [or misleading], to go uncorrected" before the trier of fact. *Hawthorne v. United States*, 504 A.2d 580, 589 (D.C.1986) (citing, *inter alia, Giglio v. United States*, 405 U.S. 150, 153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)). *See also Card v. United States*, 776 A.2d 581, 602 & n. 28 (D.C.2001), *reh'g en banc granted on other grounds* (April 29, 2002); *Keys v. United States*, 767 A.2d 255, 261 (D.C.2001). Because a prosecutor's failure to correct known false or misleading testimony of a government witness violates due process, such failure requires reversal of a conviction unless there is no reasonable possibility that the falsehood affected the jury's verdict. *See Bagley*, 473 U.S. at 678–79 n. 9, 105 S.Ct. 3375 ("[T]he standard of review applicable to the knowing use of [or failure to correct] perjured testimony is equivalent to the *Chapman* [*v. California* ] harmless error standard."); *Hawthorne*, 504 A.2d at 591 & n. 27.[6] The issue before us is therefore twofold: did Russell's denials of having told Detective Hamann about Shank's role in the shooting of Blue (and about Shank and others being armed to the teeth) go "uncorrected" before the jury; and to the extent they did—to the extent the jury could have been led thereby to underestimate Russell's fear of Shank—is there any reasonable possibility that this contributed to the jury's returning a verdict that it otherwise would not have.

### 1.

▮ Appellant does not dispute that the prosecutor brought the falsity of Russell's testimony about the statements to Detective Hamann to the trial court's attention in time for corrective measures to be considered. *See* Br. for App. at 29; Reply Br. at 2. Nevertheless, he contends that the measures taken by the court were inadequate to correct the false impression created by the testimony, and that the prosecutor was instrumental in this error by objecting to efforts to inform the jury of the perjury. The prosecutor's actions were, it appears to us, a mixture of the commendable and the blameworthy. He fulfilled his bedrock obligation under due process by apprising the court and the defense of Russell's false denials. *See, e.g., People v. Lester*, 232 Mich.App. 262, 591 N.W.2d 267, 274 (1998) ("Prosecutors ... have a constitutional obligation to report to the defendant and to the trial court whenever witnesses lie under oath.") (citing *Napue*, 360 U.S. at 269–272, 79 S.Ct. 1173).[7] On the other hand, although the

---

the government to correct Russell's false testimony—their exclusion was not prejudicial under the standard for nonconstitutional error, *see Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), for the reasons stated in the text that follows.

**6.** Alternatively, the test has been stated as whether " 'there is any reasonable *likelihood* that the false testimony *could* have affected the judgment of the jury.' " *Bagley*, 473 U.S. at 678–79, 105 S.Ct. 3375 (quoting *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (emphasis added)); *see Keys*, 767 A.2d at 261. As footnote 9 of *Bagley* makes clear, however, there is no substantive difference in these formulations.

**7.** *See also United States v. Decker*, 543 F.2d 1102, 1105 (5th Cir.1976) ("[T]he government fulfilled its duty of disclosure by supplying [the defendants] with its recollection of the true circumstances of the negotiations with the witnesses at a time when recall and fur-

prosecutor could fairly argue in good faith that the questions to Russell regarding his conversation with Hamann about an unrelated shooting were irrelevant and should be stricken, once the court rejected that argument the prosecutor was obligated to assist in neutralizing any effect the false denials might have had on the jury's deliberations. In that regard, by objecting even to the cross-examination of Hamann on the subject, we think the prosecutor fell short in that responsibility. Nevertheless, "the touchstone of due process" in cases such as this "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips,* 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982); *United States v. Meinster,* 619 F.2d 1041, 1044 (4th Cir.1980) (underlying purpose of *Napue* and *Giglio* is not to punish prosecutor for misdeeds of a witness, but to ensure jury is not misled by falsehoods).[8] The question before us then is whether the trial court erred in concluding that the cross-examination of Hamann that took place was sufficient in the circumstances to correct Russell's false denials. We hold that it was.

During cross-examination by the defense, Hamann admitted that Russell had told him that Shank shot Blue and that Shank and "the guys at 18th and D were armed to the teeth."[9] This was testimony by an agent of the government who had

been involved in investigating the shooting of Mr. Yun from early on and who, it could at least be argued, had an interest in appellant's prosecution ending successfully. The significance of his contradiction of Russell's testimony was fully understood by defense counsel, who argued in summation:

And you know Mr. Russell can't be consistent about things having to do with [Shank]. Mr. Russell says no, I never told Detective Hammond [*sic*] that [Shank] shot [B]lue or that they had a rack of arms to the teeth. That group has got ... Mac 10s ... And you know from Detective Hammond that he [Russell] said all those things.

\*       \*       \*       \*       \*       \*

What else do you know? You know that he [Russell] said that [Shank] is somebody that it makes sense to be afraid of. That, I think Mr. Russell denied being afraid—there's a shock—about [Shank]. But that Detective Hammond said, oh, he indicated he was someone you treat with caution. You know that he [Shank] is dangerous because you know that he shot this other guy, and you know he is armed to the teeth and you know that Herb Russell knows all those things and you know he can't tell the truth about [them].

ther exploration of these matters was still possible."); *Keys,* 767 A.2d at 262 ("The prosecutor promptly brought [the witness's] recantation to the attention of the court and the defense."); *cf.* Rule 3.3(d), Rules of Professional Conduct of the District of Columbia ("A lawyer who [has] information clearly establishing that a fraud has been perpetrated upon the tribunal shall promptly reveal the fraud to the tribunal.").

8. As this court has stated in discussing a similar claim of violation of the *Giglio/Napue* duty, "although [Bruce's] complaint is primarily with the prosecutor, it is our function

to review the record for [prejudicial] legal error or abuse of discretion by the trial judge, not by counsel." *Bruce v. United States,* 617 A.2d 986, 993 (D.C.1992) (citation and quotation marks omitted).

9. Examining Hamann's answers as a whole, we reject appellant's suggestion that Hamann equivocated on these points. His comment that "this is all hearsay" may have been designed to minimize the significance of the information received from Russell, but it did not alter the fact that Russell had told him those things.

In rebuttal argument, the prosecutor did not dispute that Hamann's version of what Russell had told him about Shank was the truth. The explicit contradiction of Russell's testimony by Hamann distinguishes this case from *Hawthorne, supra,* relied on by appellant, where the cross-examination "never flatly contradicted" the perjured testimony, 504 A.2d at 591; and distinguishes it as well from *United States v. LaPage,* 231 F.3d 488 (9th Cir.2000), in which "the prosecutor sat silently as his witness lied" and as "ineffectual" efforts were made to expose the lie through cross-examination. *Id.* at 492. (Indeed, only in rebuttal argument in *LaPage* did the prosecutor grudgingly admit the falsity "after the defense ha[d] used up its last chance to address the jury.") *Id.* In sum, this is not a case where "a 'presentation of known false evidence' ... went uncorrected." *Hawthorne,* 504 A.2d at 591 (quoting *Giglio,* 405 U.S. at 153, 92 S.Ct. 763). *See also United States v. O'Keefe,* 128 F.3d 885, 895 (5th Cir.1997) (no error where defense elicited contradictory information through cross-examination and had opportunity to use the information "to powerful effect"); *United States v. Grosz,* 76 F.3d 1318, 1327–28 (5th Cir.1996) (affirming conviction where defense had access to and made use of evidence that contradicted government witness' falsehood); *United States v. Adebayo,* 985 F.2d 1333, 1342 (7th Cir.1993) (no *Napue* violation where defense had "leeway" to explore government witness' falsehood on cross-examination and took advantage of it, "mounting a vigorous and lengthy attack on the witness' credibility").

Appellant argues that the misimpression from Russell's false denials could not be cured by Hamann's testimony alone (pointing out, *inter alia,* that Hamann denied Russell had said he was afraid of Shank, saying instead "he was very cautious"). It could only be corrected fully, in appellant's view, by a stipulation that Russell feared Shank or by letting the jury hear—as an admission of a party-opponent, see note 5, *supra*—the prosecutor's acknowledgment that Russell had lied because he was "extremely fearful" of Shank. And this was not just a matter of the prosecutor's opinion, appellant asserts, because the prosecutor later conceded that "someone else" had told Russell to deny "publicly" having accused Shank of the Blue shooting if he were afraid of Shank. Appellant thus traces a direct line between Russell's false denials that he had accused Shank (and so feared reprisal from Shank and others "armed to the teeth") and the prosecutor's ability to argue in summation that "[t]he person that Mr. Russell was afraid of" was actually appellant, not Shank.

We are not persuaded. Evidence did allow the prosecutor to argue that Russell had testified despite having reason to fear appellant.[10] But more to the point, Hamann's testimony enabled appellant to argue the *facts* supporting an inference that Russell feared Shank enough to incriminate the wrong person, and would violate his oath as a witness to do so. By contrast, the prosecutor's view as to why Russell had lied was essentially that—an opinion: as he later explained to the trial court, "I offered my understanding of a potential explanation as to why ... Russell might have denied [the conversation]." The fact that someone else, presumably Detective Hamann, had advised Russell to deny "publicly" that he had connected Shank with another shooting adds little to the equation. Hamann, the prosecutor elabo-

---

10. Russell was permitted to testify that appellant had robbed him at gunpoint some three years before trial, and that in an encounter (apparently in jail) two days before trial, appellant had "called [him] a bitch m.f."

rated, had apparently told Russell that on "many occasions out in the street when asked by other people[,] he has advised witnesses to deny their involvement." The meaning of this is unclear; it appears to speak as much to Hamann's concern to protect ongoing investigations as it does to Russell's fear of Shank. Defense counsel herself thought the advice of little value because she did not question Hamann about it, argue its significance to the jury, or cite it to the court as additional support for steps beyond cross-examination of Hamann to neutralize Russell's perjury. We conclude that whatever motive Russell had to accuse appellant falsely instead of Shank was ventilated fully before the jury through the combination of Russell's testimony, its contradiction by Detective Hamann, and the other evidence—Russell's grand jury testimony and his alleged statements to the defense investigator—of his changing versions of what had happened.

### 2.

■ Even assuming that, despite Detective Hamann's contrary testimony, the jury had a lingering misimpression from Russell's denials of how much he feared Shank, the question remains whether this may have led the jury reasonably to return a verdict it otherwise would not have. In this regard the government's case overall, and Russell's importance to it, must be considered. *See Hawthorne*, 504 A.2d at 591 ("the importance of [the witness'] testimony . . . and the independent evidence of [the defendant's] guilt" must be considered in determining whether the witness' "false testimony 'could in any reasonable likelihood have affected the judgment of the jury'") (citation omitted). Russell undeniably was a key witness: he had known appellant for years, and he alone heard appellant struggle with Mr. Yun just before the shooting took place. But his description of appellant as the man wearing a gray hooded sweatshirt who fled the shop right after the shooting was firmly corroborated. Valdez Hall saw appellant dressed in the hooded shirt or coat riding his bicycle, entering the store, and then running by Hall seconds after a shot was fired inside the store. Mrs. Yun described the assailant as wearing the same clothes—unusual for August—that Russell and Hall said he had worn. Hazel Evans saw a man similarly dressed standing near a phone booth and putting on gloves that hot August morning, then leaving the liquor store just after the shot was fired. And Rudolph Lindsey confirmed that a man dressed in a sweatshirt with the hood pulled tight had been pretending to use the public phone while standing or seated next to a bike. By appellant's own admission in his post-arrest statement, that bicycle belonged to him, he had been riding it on the day of the murder, and he had used the pay phone near the liquor store on the same morning. All told, there is no reasonable possibility that a further demonstration that Russell had lied in denying statements to a detective about an unrelated shooting would have caused the jury to discredit the identification of appellant as Yun's slayer and return a different verdict. *See Belmontes v. Woodford*, 335 F.3d 1024, 1045 (9th Cir.2003) (finding that false testimony would not have affected the judgment of the jury where government witness' account of events surrounding the murder "was in most respects corroborated by independent witnesses").

### III.

■ Appellant contends that the trial court undermined his alibi defense when it allowed the prosecutor in closing argument to comment upon appellant's failure to call his girlfriend, Gina King, to the stand to confirm his statement to the police that he had been with her at the time of the

shooting. We hold that any arguable error in this regard was not prejudicial enough to require reversal.[11]

Before closing arguments, the prosecutor sought permission to argue that appellant's alibi was uncorroborated even though his post-arrest statement "list[ed] no less than four individuals" (the prosecution's words) who supposedly could have confirmed the alibi. Because the prosecutor conceded that Gina King was available to either side to be called as a witness, the court barred the prosecutor from mentioning Ms. King's absence but allowed him to argue that, except for appellant's statement to the police, the government's evidence regarding his whereabouts at the time of the shooting was uncontested. The prosecutor hewed to this limitation in his initial argument. Appellant argues still that this was tantamount to an unjustified missing witness argument because the jury, in possession of his written statement to the police, would use it to "fill in the blanks" of the prosecutor's reference to the absence of evidence contesting appellant's presence at the scene. The government counters with cases holding it proper for the prosecutor to argue in analogous circumstances "that the government's evidence [is] uncontradicted." *Owens v. United States*, 688 A.2d 399, 405 (D.C.1996) (citation and internal quotation marks omitted) (rejecting claim that the quoted language commented on the defen-

dant's failure to testify). We find no abuse of discretion in the trial court's permitting that argument without mention of King. *See generally Lawson v. United States*, 514 A.2d 787, 790 (D.C.1986).

■ The matter is more problematical when we turn to the prosecutor's rebuttal argument. In appellant's closing, his counsel did what the prosecutor had refrained from doing: she pointed out that only "[t]hese two guys" Russell and Hall had "contradict[ed] Mr. Woodall's [alibi] statement," and, moreover, "you know the police came and they talked to *Gina King and verified her address* " (emphasis added).[12] The prosecutor did not object to this thinly veiled allusion to King's availability to the government; instead he returned to the theme in rebuttal:

> [T]he defense pointed out to you that the government interviewed Ms. King. Knew who Ms. King was. She was the defendant's girlfriend. The government did not call the defendant's girlfriend when the defendant represented her as an alibi witness in the statement. Neither did the defense call the defendant's girlfriend to substantiate the alibi in the statement. You're entitled to think of that as you evaluate this case.

Although not disputing that no predicate was laid for a missing witness argument (either of the complete or the "incomplete"

---

11. Appellant makes a broader argument that overreaching by the prosecutor—specifically, "abusive subpoenas and threats of perjury"— "forced" Gina King from the witness stand and made her unavailable to the defense. All that supports this in the record, however, is defense counsel's own assertions; no affidavit by King was offered, nor did any other evidence require the trial court to find that government intimidation was the reason the defense had failed to call King to testify. The court likewise did not abuse its discretion in refusing appellant's request for King to be allowed to review her grand jury testimony to avoid "innocent inconsistencies" if she testified at trial. *See, e.g., Davis v. United States*, 641 A.2d 484, 492 (D.C.1994) (quoting *United States v. Alexander*, 428 A.2d 42, 54 (D.C. 1981)).

12. In forbidding the prosecutor to mention King's absence, the court impliedly had meant that the defense could not suggest her availability either, for the reason that either side was free to call her.

variety),[13] the government argues that these comments were permissible to counteract appellant's allusion in argument to King's availability. The proper remedy, however, for appellant's breach of the court's ruling not to suggest King's availability was an objection and motion to strike, not a similar transgression by the prosecutor. *See generally United States v. Young*, 470 U.S. 1, 13, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); *id.* at 11, 105 S.Ct. 1038 ("two apparent wrongs ... do not make for a right result").

■ We find it unnecessary to pursue this question further, however, because any impropriety in the court's allowing the prosecutor to "respond in kind," *see id.* at 12, 105 S.Ct. 1038, was not so prejudicial as to justify reversal. The trial court gave no missing witness instruction and thus lent no arguable imprimatur to an inference that King's testimony would have been adverse to appellant.[14] Nor did the prosecutor expressly ask the jury to draw such an inference, only telling it that it was "entitled to think of [the defense's failure to call her] as you evaluate this case." Moreover, on the question of prejudice (as distinct from error), *Young* instructs us that "to make an appropriate assessment, the reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo." *Young*, 470 U.S. at 12, 105 S.Ct. 1038.[15] Here, we think,

the effect of the combined closing arguments was to tell the jury that neither side had seen enough advantage in King's testimony to call her as a witness. If we add to this the court's final instruction to the jury that arguments of counsel are not evidence, we find no realistic likelihood that the prosecutor's argument caused the jury to reject a defense of alibi that it otherwise would have accepted. *See Kotteakos, supra* note 5.

## IV.

■ Appellant's remaining arguments may be dealt with more summarily. He contends that the trial court erroneously refused to let him cross-examine Detective Pamela Reed about a practice, which the defense claimed she had admitted to in another case, of interviewing suspects without reading them their *Miranda* rights.[16] Appellant argues that this would have shed negative light on his identification by Valdez Hall, who had identified him only after prolonged interaction with the police culminating in an interview by Detective Reed. She acknowledged on the stand that her "pretty good people skills" had put Hall at ease and contributed to his willingness to speak candidly. We find no abuse of discretion in the preclusion of the *Miranda*-related questioning. Hall was not suspected of a crime nor was he in custody; he was a witness to a crime, and

13. *See Arnold v. United States*, 511 A.2d 399, 415–16 (D.C.1986). The requirements for such an argument are set forth in cases such as *Thomas v. United States*, 447 A.2d 52, 57–58 (D.C.1982).

14. *See Burgess v. United States*, 142 U.S.App. D.C. 198, 207, 440 F.2d 226, 235 (1970) ("Argument of counsel is on quite a different legal level from an instruction of the court granting to the jury the right to draw the inference of unfavorable testimony. Such an instruction has the weight of law, even when it only

permits and does not require the inference, whereas counsel's argument is only that.").

15. *See also Young*, 470 U.S. at 12–13, 105 S.Ct. 1038 ("[T]he import of the evaluation has been that if the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction.") (footnote omitted).

16. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

so the relevance of Reed's conduct in interrogating criminal suspects was marginal and—the trial court could properly find—outweighed by the debate it predictably would have engendered over when *Miranda* comes into play and related considerations. *See Coles v. United States,* 808 A.2d 485, 488 (D.C.2002); *Crutchfield v. United States,* 779 A.2d 307, 316 (D.C. 2001). Appellant otherwise was allowed to question Reed freely in attempting to establish that her "good people skills" meant that she was adept at "getting people to talk," as well as that she would bend the rules—by failing to preserve interview notes, for example—to obtain what she wanted. The single limitation on questioning did not prejudice him.

■ Appellant argues further that four government witnesses, among them the two detectives already mentioned and Detective Leech, blurted out inadmissible answers at trial and that the court took inadequate measures to cure this abuse. In each instance, however, we are satisfied that the court assessed the risk that the answers could prejudice appellant and properly exercised its "considerable discretion" in taking corrective actions.[17] *See Coleman v. United States,* 779 A.2d 297, 302 (D.C.2001). The court likewise neutralized any arguable prejudice from the prosecutor's having issued subpoenas to witnesses in a manner that could have led them to believe they were compelled to attend government interviews. In these circumstances, the court was not obliged to grant the relief appellant requested of dismissal of the indictment. *See generally Williams v. United States,* 757 A.2d 100, 105–06 (D.C.2000).[18]

Accordingly, except for the convictions that the government agrees must be vacated on remand, see note 1, *supra,* the judgments of conviction are

*Affirmed.*

RUIZ, Associate Judge, concurring:

I write separately to make clear that the prosecutor did not fulfill his duty in this case. I concur with the disposition of this case because I agree that, considering the evidence as a whole, there was no prejudice to appellant that would require reversal. Our affirmance is due to the ruling of the trial judge that permitted defense counsel to bring to light during cross-examination of Detective Hamann evidence that flatly contradicted and corrected a material falsehood that had been presented by Russell, an important government witness who identified appellant as the robber and murderer during the government's case in chief. In coming to the conclusion that reversal is not required in a case where the prosecutor did not correct testimony he knew to be false, it is key that the correction came from a witness the jury would view as representing the government's position. Were it not for defense counsel's questioning and the answer it elicited, the government would have "permit[ted] false evidence, known to be false, to go uncorrected," *see Keys v. United States,* 767 A.2d 255, 261 (D.C. 2001), and the jury would have retired to deliberate over evidence that contained a significant lie relevant to the credibility of a critical witness in the case. Because there would have been a reasonable likelihood that false evidence tainted the jury's verdict, we would have had to reverse. *See Hawthorne v. United States,* 504 A.2d

---

**17.** In two instances, for example, the court ordered the witnesses's answer stricken as unresponsive or contrary to a prior court ruling.

**18.** We have considered appellant's remaining arguments and reject them as well.

580, 589–90 (D.C.1986) (citing *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)). Such a result not only would have violated appellant's due process rights, but also needlessly imperiled the interest of our criminal justice system in assuring sound convictions that will withstand challenge on appeal.

The Constitution's Due Process Clause is violated if a conviction is obtained because the government knowingly used false evidence or "allow[ed] it to go uncorrected." *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Hawthorne*, 504 A.2d at 589 (citing *Giglio*, 405 U.S. at 153, 92 S.Ct. 763). Because in a jury trial the jury is the exclusive finder of fact and arbiter of guilt, it is ultimately the jurors—not the judge or defense counsel—who are "entitled to know" of false testimony that might affect a witness's credibility. *Giglio*, 405 U.S. at 155, 92 S.Ct. 763; *Napue*, 360 U.S. at 269, 79 S.Ct. 1173. The "responsibility and duty to correct [a known falsehood] and elicit the truth" lies with the prosecutor. *Napue*, 360 U.S. at 269, 79 S.Ct. 1173 (quoting *People v. Savvides*, 1 N.Y.2d 554, 154 N.Y.S.2d 885, 136 N.E.2d 853, 854 (1956)); *see also Giglio*, 405 U.S. at 154, 92 S.Ct. 763 ("whether the nondisclosure was the result of negligence or design, it is the responsibility of the prosecutor"). In this case, the prosecutor took the necessary first step in discharging that responsibility by disclosing to the trial judge and to defense counsel that Russell had testified falsely, but he did not take the further steps necessary to "elicit the truth" for the

jury. Quite the opposite, he improperly tried to block the defense's efforts to bring the true facts to the jury's attention: he refused a defense offer to enter into a joint stipulation on what the prosecutor had already agreed were the correct facts; interposed a questionable argument against the defense's request for an admission of a party opponent; objected to defense counsel's effort to cross-examine Detective Hamann on the subject on the ground that it was irrelevant even after the trial judge had already ruled to the contrary; and, though he agreed that the witness had committed perjury, objected to the defense request for the standard instruction on evaluating the testimony of an admitted perjurer.[1]

These efforts by the defense were intended to correct Russell's untruthful testimony by bringing before the jury the fact that Russell falsely denied giving information to Detective Hamann about a separate shooting committed by Shank and falsely denied expressing his fear of Shank, who, according to Russell, was "armed to the teeth." This was important information for the jury to consider because Shank was the person who the defense contended had committed the murder in this case. The defense's theory was not improbable because Shank—the son of the co-perpetrator identified by the eyewitness to the murder in this case—appeared to fit the description of a man seen leaving the store immediately after the murder. The defense argued that because Russell was so afraid of Shank, Russell purposely misidentified appellant as the person who

---

1. Thus, this is not a case, such as *Bruce v. United States*, 617 A.2d 986 (D.C.1992), *cert. denied*, 507 U.S. 1042, 113 S.Ct. 1878, 123 L.Ed.2d 496 (1993), where neither the prosecutor nor defense counsel did anything despite the fact that *both already knew* that the particular testimony at issue was false in light of FBI tests. *See id.* at 993. Even in that case, where we said that "it was at least arguably appropriate for the prosecutor to leave it to defense counsel to propose a way to protect the interests of his client," *id.* at 993, we suggested that "it may well have been prudent" for the prosecutor to be proactive. *See id.* at 992. Applying plain error review, we affirmed the conviction.

committed this crime instead of correctly identifying the fearsome Shank. The prosecutor did not at any time dispute that Russell had in fact accused Shank of another shooting in his conversation with Detective Hamann or that Russell was afraid of Shank, yet he interposed objection after objection to defense counsel's various proposals to correct Russell's false testimony. The prosecutor's primary objection was irrelevance. This insubstantial objection was easily and correctly rejected by the judge early in the trial. *See Winfield v. United States,* 676 A.2d 1, 4 (D.C. 1996) (en banc). But, as the majority opinion points out, the prosecutor persisted in this objection even after the trial judge had overruled it.[2] And even after defense counsel's cross-examination of Detective Hamann exposed that Russell's denial of his conversation with the Detective was a lie, the prosecutor did not stand squarely behind what he knew to be the correct version when he last addressed the jury in rebuttal, but rather, suggested that Russell's credibility on the issue was a question for the jury.[3]

A good prosecutor should press hard to obtain a conviction he believes is warranted by the evidence, but once the prosecutor knows that the government's case is tainted with false evidence that could be material to the jury's verdict, the constitutional imperative requires that the prosecutor's zeal yield to his duty to ensure that the false evidence is corrected and the truth clearly presented to the jury. *Cf. Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) (explaining that the state's interest "in a criminal prosecution is not that it shall win a case, but that justice shall be done"). That did not happen in this case, where the course of the prosecution—if not overcome by defense counsel and the trial court—would have "allow[ed a material falsehood] to go uncorrected." *Napue,* 360 U.S. at 269, 79

---

**2.** The prosecutor's other objections were weak, to say the least. While acknowledging that Russell had lied when he denied having talked to Detective Hamann about Shank, the prosecutor objected to disclosing Russell's actual statements to Detective Hamann because they had been given "in confidence." The prosecutor objected to the request for admission on the ground that the government was not a party-opponent. *But see Harris v. United States,* 834 A.2d 106, 118 (D.C.2003) (citing *Freeland v. United States,* 631 A.2d 1186 (D.C.1993)).

**3.** The prosecutor argued in closing that Russell had greater cause to fear appellant, who had cursed at him during the trial and some years earlier had robbed and threatened him at gun point, and that it did not make sense to say that Russell did not want to implicate Shank in the murder out of fear when Russell had been willing to implicate Shank's mother. The prosecutor did not, however, acknowledge Russell's conversation with Detective Hamann that he feared Shank. In her closing argument, defense counsel emphasized Russell's fear of Shank, as evidenced by his denial of the conversation with Detective Hamann, in an effort to create reasonable doubt about Russell's motivation in identifying appellant as the murderer in this case. On rebuttal, the prosecutor did not concede the truth of Detective Hamann's testimony that Russell was afraid of Shank. Instead, the prosecutor told the jury that Detective Hamann testified about "the context" of Russell's conversation with him, inviting the jury to decide whether Russell had expressed a fear of Shank in his conversation with Detective Hamann. The prosecutor also mischaracterized the defense's argument, saying that the defense wanted to "have it both ways" in its evaluation of Russell's credibility. The defense was not attempting to have it "both ways," as its contention was that Russell had lied on the stand both when he denied talking to Detective Hamann about Shank and when he identified appellant as the murderer. It was Detective Hamann's testimony that Russell had told him about fearing Shank—which the prosecutor had told the court was the truth—that defense counsel argued to the jury should be credited in evaluating Russell's identification and trial testimony.

S.Ct. 1173. If the prosecutor does not take the situation in hand to effectively correct the testimony before the jury, then, at a minimum, he should not obstruct the efforts of others who would do so. The fact that defense counsel and the trial judge ensured that the jury had the necessary correction enables us to affirm the conviction, but it should not obscure the prosecutor's failure in this case to fulfill his constitutional responsibility to ensure the fundamental fairness of the trial.