**Cortez GATLIN, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 03–CF–1173.**

District of Columbia Court of Appeals.

Argued May 10, 2007.

Decided June 7, 2007.

decision for their removal of the uncontested provisions, we need not address this argument.

Jonathan Zucker, appointed by the court, for appellant.

Elizabeth H. Danello, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney, and Roy W. McLeese III, Elizabeth Trosman, and Gary M. Wheeler, Assistant United States Attorneys, were on the brief, for appellee.

Before REID and BLACKBURNE-RIGSBY, Associate Judges, and KING, Senior Judge.

REID, Associate Judge:

A jury convicted appellant, Cortez Gatlin, of second-degree murder (of Kevin Buckman) while armed, a lesser included offense of the charged first-degree (premeditated) murder while armed;[1] and assault with a dangerous weapon (baseball bat), in violation of D.C.Code § 22–502 (1996), recodified at D.C.Code § 22–402 (2001).[2] He challenges his convictions mainly on the grounds that (1) the trial court violated his constitutional Sixth Amendment confrontation right by admitting into evidence the grand jury testimo-

ny of decedent, Troy Jones; and (2) the trial court's rulings relating to the false testimony of a government witness violated his Fifth and Sixth Amendment constitutional rights. We affirm the judgment of the trial court and hold that (1) the trial court did not violate Mr. Gatlin's constitutional confrontation right and that, in this jurisdiction, the preponderance of the evidence standard continues to govern "predicate facts" in post-*Crawford*[3] cases where the government seeks to introduce grand jury testimony on the theory that the defendant is responsible for a witness's unavailability; and (2) Mr. Gatlin suffered no due process violation necessitating a new trial because we do not see any reasonable likelihood that a government witness's unexpected accusation against defense counsel on cross-examination (that he attempted to suborn perjury) could have affected the jury's verdict.

**FACTUAL SUMMARY**

The government presented evidence showing that the murder of Kevin Buckman, on July 28, 1998, grew out of an earlier theft of drugs and guns from the home of Damien Champion by Mr. Buckman. Mr. Gatlin was a close friend and associate of Mr. Champion; witnesses described them as brothers or like brothers because Mr. Gatlin stayed with Mr. Champion's family after his mother died. Following the theft, government witness Sandra Levi[4] encountered Mr. Gatlin who had a bat in his hand and who admonished Ms.

---

1. The superseding indictment charged Mr. Gatlin with murder in the first-degree while armed, in violation of D.C.Code §§ 22–2401, –3202 (1996), recodified at D.C.Code §§ 22–2101, –4502 (2001). Mr. Gatlin was tried on an earlier indictment and convicted of drug violations, but the trial court declared a mistrial when the jury could not reach agreement on the murder charge.

2. The jury found Mr. Gatlin not guilty of the following charges: first-degree (premeditated) murder (of Troy Jones) while armed; obstruction of justice, and two counts of threats.

3. *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

4. Ms. Levi's last name also appears in the record as "Levy."

Levi not to tell Mr. Buckman he was looking for him. Later, government witness Lowan Bowman, Mr. Buckman's ex-girlfriend, saw him holding his side, in obvious pain, and Ms. Levi observed him "spitting up blood." Derron Smith (who killed Mr. Champion in 1999, and who entered a guilty plea to manslaughter while armed), witnessed Mr. Gatlin beating Mr. Buckman with a wooden baseball bat in the summer of 1998. Mr. Gatlin admitted to two other government witnesses that he beat Mr. Buckman.

Even after the baseball bat beating, Mr. Gatlin continued to pursue Mr. Buckman. On July 28, 1998, Mr. Champion and Mr. Gatlin searched for Mr. Buckman. Just as they were asking Michelle Hunter whether she had seen Mr. Buckman, they noticed him as he left an alley and called to him. Ms. Hunter soon heard Mr. Buckman "holler[ ] [that] he had been stabbed." Mr. Gatlin ran down the street toward Mr. Champion, asking for a gun. Once he obtained a gun, Mr. Gatlin ran back to Mr. Buckman. Mr. Buckman had begun to run, but collapsed in the street. When a car appeared on the scene, Mr. Gatlin and Mr. Champion fled.

Another government witness, Isaiah Ray, testified that he saw Mr. Buckman coming out of the alley. Mr. Gatlin approached on a bicycle and called Mr. Buckman. Mr. Ray watched as Mr. Gatlin "was sticking [the decedent] in his chest with ... a knife." Mr. Buckman "started hollering" and "ran." Mr. Buckman said he was "dying" and "keeled over." With gun in hand, Mr. Gatlin ran towards Mr. Buckman. Those around, including Mr. Ray, distracted him by saying the police were coming. Both Mr. Gatlin and Mr. Champion took flight. The prosecution presented the grand jury testimony of a third eyewitness, decedent Troy Jones, who saw Mr. Gatlin stab Mr. Buckman in the chest.

## ANALYSIS

### *The Troy Jones' Grand Jury Testimony Issue and Forfeiture Misconduct*

■ Mr. Gatlin contends that the trial court erred by admitting decedent Jones' grand jury testimony, which was not subjected to cross-examination. He asserts that under *Crawford, supra,* Mr. Jones' "grand jury testimony, presented under oath, is clearly testimonial hearsay within the meaning given by the Supreme Court." The trial court admitted Mr. Jones' grand jury testimony under the doctrine of waiver or forfeiture by wrongdoing, and Mr. Gatlin acknowledges that this doctrine "survives *Crawford.*" However, he takes issue with the trial court's use of the preponderance of the evidence standard in admitting the grand jury testimony, insisting that "[b]ecause the admission of testimonial hearsay under the rules of evidence is not the equivalent to a ruling on ... admissibility under the Confrontation Clause, there is a logical reason to impose a higher standard for proving an equitable exception to the Confrontation Clause." He advocates "the clear and convincing standard as the appropriate degree of proof." Moreover, he re-emphasizes the fact in his reply brief that "[b]ecause the jury unanimously acquitted defendant of the murder of Troy Jones, of participating in a conspiracy to obstruct justice by threatening witnesses and of individual threat counts, the standard of proof used by the trial court to determine the applicability of the equitable forfeiture doctrine may be determinative of the outcome."

The government argues that the trial court properly admitted Mr. Jones' grand jury testimony under existing precedent, and applied the correct standard of proof, preponderance of the evidence. Furthermore, the government emphasizes the applicability of the co-conspirator liability

principle: "[C]o-conspirators can be held vicariously liable for offenses committed by other co-conspirators where the offenses are in furtherance of the conspiracy and reasonably foreseeable as a necessary or natural consequence of the conspiracy." It is the government's position "that a defendant forfeits Confrontation Clause and hearsay objections if he participates in a conspiracy and the death of a witness is in furtherance of the conspiracy and reasonably foreseeable as a natural consequence." The government further asserts that "there was ample evidence of a conspiracy to silence witnesses" in this case, and that "the evidence showed . . . that [Mr. Gatlin] participated in this conspiracy."

In explaining why it admitted the grand jury testimony of Mr. Jones (although Mr. Gatlin was incarcerated when Mr. Jones was murdered), the trial court remarked that "the government's theory of [Mr. Gatlin's] liability is as a co-conspirator in a conspiracy to obstruct justice, which culminates under the government's theory in the homicide of Mr. Jones on the eve of the first trial." As evidence of Mr. Gatlin's involvement in the conspiracy to obstruct justice, the court mentioned the testimony of Mr. Ray, which it credited, "that [Mr. Gatlin] claimed credit for Mr. Jones's death in a cell block conversation between Mr. Ray and Mr. Gatlin on October 5th, 1999." During that conversation, which occurred "two weeks after the murder of Mr. Jones," Mr. Gatlin threatened Mr. Ray, saying: "I can't get to you right now, but what I had done to Troy I can have done to your mother." Mr. Ray communicated his encounter with Mr. Gatlin to his attorney and in testimony at Mr. Gatlin's trial, the attorney, who saw Mr. Gatlin about five days later, took notes which were consistent with Mr. Ray's trial account of the incident.[5] The court also singled out the testimony of Derron Smith, that "just days after the Buckman murder, [he] hear[d] [Mr. Gatlin] and Damien Champion talking about getting rid of witnesses." Mr. Champion pressured Sandra Levy to tears and "urg[ed] Ms. Levy and [Mr. Jones] [both of whom were to testify as government witnesses] to change their story and to give a false story."[6]

---

5. The trial court detailed its reasons for finding Mr. Ray's testimony generally credible, despite his apparently false accusation that defense counsel asked him to place the blame for Mr. Buckman's death on Mr. Champion, rather than Mr. Gatlin. See the discussion of the false testimony issue, *infra*.

6. The trial court recalled Mr. Smith's testimony that Mr. Gatlin continued to pressure him, even "calling him from the jail and asking him to take care of Sandy, Ms. Levy, that is to kill Sandy." In addition, the trial court cited other examples of the conspiracy and focused on the "close relationship" between Mr. Champion and Mr. Gatlin both as family related and as associates in the drug operation, and the close connection between Deon Oliver and Mr. Champion. Mr. Oliver "approached . . . witnesses [including Andia Evans] in an apparent attempt to intimidate them or influence their testimony." Ms. Evans, "a close friend of Mr. Gatlin's, admitted that at the jail when she went to visit Mr. Gatlin with Damien Champion, she heard a discussion between the two of them as to exactly who the witnesses are and that Mr. Champion is talking about handling the witnesses. . . ." Ms. Hunter, "one of the witnesses who had the most to fear, . . . was approached by [Mr.] Oliver on September 1st, 1999 in a car and Mr. Oliver angrily asked her if she was going to testify in this case, which she denied." Mr. Champion confronted Connie Johnson, the witness who "found the knife that was used to kill Mr. Buckman, . . . and told [her] to give a false story to [Mr. Gatlin's] lawyers," which she did out of fear. Mr. Oliver "approached [Ms. Levy] at least two separate times," in an effort to intimidate her. On the second occasion, September 20th, she was standing with Mr. Jones when Mr. Oliver "said to the two of them, you and you can go testify if you want." Mr. Jones was murdered later that day.

The trial court found "that the government has established the basic elements of a conspiracy that the ... defendant is personally involved in," and that "the government [ ] set up the contours of a conspiracy ... by virtue of the agreement, Mr. Champion and Mr. Oliver's and Mr. Gatlin's concerted actions to intimidate witnesses...." The court added, "I think there was an additional basis, the co-conspirator exception, for all of those witnesses' statements, [meaning, for example, Mr. Smith, Ms. Levy, and Mr. Ray]."

We turn now to the legal principles which guide our analysis of the grand jury testimony issue. In *Devonshire v. United States*, 691 A.2d 165, 168–69 (D.C.1997), we held that a defendant who is "responsible for [a] witness's unavailability, ... cannot prevent the introduction [of the witness/decedent's statement] on grounds that his right to confront the witness has been denied him." The defendant also "waive[s] any hearsay objections." *Id.* at 169 (citing *United States v. Houlihan*, 92 F.3d 1271, 1281 (1st Cir.1996); *United States v. White*, 838 F.Supp. 618, 621 (D.D.C.1993)) (other citations omitted). We declared that the standard of proof governing "predicate facts" is a "preponderance of the evidence." *Id.* at 169 (citing *Houlihan*, 92 F.3d at 1280). *Crawford, supra*, involving the confrontation right, did not invalidate the waiver by wrongdoing, or forfeiture by wrongdoing doctrine. The Supreme Court underscored the importance of the doctrine in a later decision:

> [W]hen defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce. While defendants have no duty to assist the State

in proving their guilt, they *do* have the duty to refrain from acting in ways that destroy the integrity of the criminal-trial system. We reiterate what we said in *Crawford*: that "the rule of forfeiture by wrongdoing ... extinguishes confrontation claims on essentially equitable grounds." That is, one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation.

*Davis v. Washington*, — U.S. —, —, 126 S.Ct. 2266, 2280, 165 L.Ed.2d 224 (2006) (quoting *Crawford, supra*, 541 U.S. at 62, 124 S.Ct. 1354 (other citation omitted)) (emphasis in original).[7]

With respect to co-conspirator liability, we said in *Gordon v. United States*, 783 A.2d 575 (D.C.2001), "a co-conspirator who does not directly commit a substantive offense may nonetheless be held liable for that offense if it was committed by another co-conspirator in furtherance of the conspiracy and was a reasonably foreseeable consequence of the conspiratorial agreement." *Id.* at 582 (citing *Pinkerton v. United States*, 328 U.S. 640, 646–47, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946)). "The government is not ... required to establish that the co-conspirator actually aided the perpetrator in the commission of the substantive crime, but only that the crime was committed in furtherance of the conspiracy." *Wilson–Bey v. United States*, 903 A.2d 818, 840 (D.C.2006) (en banc).

In this case, we conclude that the trial court properly applied co-conspirator liability principles and the forfeiture by wrongdoing doctrine to reject Mr. Gatlin's argument that admission of Mr. Jones' grand jury testimony would violate his constitutional right of confrontation, be-

---

7. For a discussion of the forfeiture by wrongdoing doctrine, *see* James F. Flanagan, *Confrontation, Equity, and the MISNAMED exception for Forfeiture by Wrongdoing*, 14 Wm. & Mary Bill of Rts. J. 1193 (2006).

cause Mr. Jones was unavailable for cross-examination. The trial judge carefully and thoroughly articulated her rationale for applying co-conspirator liability principles, demonstrating the existence of an agreement (among Mr. Champion, Mr. Gatlin, and Mr. Oliver) and a conspiracy to intimidate government witnesses; as well as the evidence (through the testimony of Mr. Ray, Mr. Smith, Ms. Levy, Ms. Evans, Ms. Hunter, and Ms. Johnson) showing Mr. Gatlin's involvement in the conspiracy; and the murder of Mr. Jones on the same day that Mr. Oliver intimidated both Mr. Jones and Ms. Levy about testifying. It was reasonably foreseeable that intimidation of and threats to witnesses could result in the murder of a witness. In short, the trial court's application of *Pinkerton* co-conspirator liability principles to support the admission of Mr. Jones' grand jury testimony must be sustained on this record. *See United States v. Carson*, 372 U.S.App. D.C. 251, 279, 455 F.3d 336, 364 (2006) ("the reasons why a defendant forfeits his confrontation rights apply with equal force to a defendant whose co-conspirators render the witness unavailable, so long as their misconduct was within the scope of the conspiracy, and reasonably foreseeable to the defendant") (footnote omitted).

Nevertheless, Mr. Gatlin argues that even though *Crawford* preserved the forfeiture by wrongdoing doctrine, the evidentiary standard for admitting Mr. Jones' grand jury testimony after *Crawford* should be "higher" in order to prove "an equitable exception to the Confrontation Clause." The Supreme Court in *Davis*,

*supra*, took "no position on the standards necessary to demonstrate [ ] forfeiture [by wrongdoing]," *Davis*, 126 S.Ct. at 2280, but indicated that federal courts generally have imposed the preponderance of the evidence standard when "using Federal Rule of Evidence 804(b)(6), which codifies the forfeiture doctrine." [8] *Id.; see also United States v. Rivera*, 412 F.3d 562, 567 (4th Cir.2005) ("this court has addressed the proper burden of proof applicable to a Rule 804(b)(6) motion and joined the majority of circuits holding that the government need prove that the defendant engaged in or acquiesced in wrongdoing that led to the witnesses unavailability by only a preponderance of the evidence") (citation omitted); *Francis v. Duncan*, No. 03–Civ. 4959, 2004 WL 1878796, at *17 (S.D.N.Y. 2004), 2004 U.S. Dist. LEXIS 16670, at *52 ("in the Second Circuit ... the government need only prove by a preponderance of the evidence that a defendant was responsible for a witness's unavailability").[9] After contemplating the proper standard of proof following *Crawford*, one federal trial court observed: "Although there are few post-*Crawford* cases analyzing the sufficiency of evidence necessary to find that defendant forfeited his Confrontation Clause rights, it is fair to conclude from [the] evidence that the Government has met its burden to show by a preponderance of the evidence that [appellant] threatened [a witness] in order to prevent him from testifying truthfully." *United States v. Basciano*, 430 F.Supp.2d 87, 90 (E.D.N.Y.2006) (citation omitted).

Similar to the majority of federal courts, the majority of state courts addressing the

---

**8.** "Under Rule 804(b)(6) '[a] statement offered against a party that has engaged or acquiesced in wrong-doing that was intended to, and did procure the unavailability of the declarant as a witness is admissible at trial.'" *United States v. Gray*, 405 F.3d 227, 241 (4th Cir.2005).

**9.** Prior to *Crawford*, the Fifth Circuit adopted a "clear and convincing evidence" standard in forfeiture by misconduct cases involving the unavailability of a witness, *see United States v. Thevis*, 665 F.2d 616, 631 (5th Cir. 1982).

burden of proof issue have opted for the preponderance of evidence standard. The Supreme Judicial Court of Massachusetts, in a thoughtful and well-researched opinion (which was cited in *Davis, supra* ) rejected adoption of the clear and convincing evidentiary standard and declared:

> We, like virtually all of the jurisdictions that have considered the issue, hold that the prosecution must prove by a preponderance of the evidence that the defendant procured the witness's unavailability. A majority of United States Courts of Appeals have applied the preponderance standard and Fed.R.Evid. 804(b)(6) adopts that standard. A majority of those states that have ruled on the standard of proof have similarly applied the preponderance standard.

*Commonwealth v. Edwards,* 444 Mass. 526, 830 N.E.2d 158, 172 (2005) (footnotes omitted). The court stated that the preponderance of the evidence standard is similarly used in the co-conspirator context: "[T]he admission of statements through the forfeiture by wrongdoing doctrine is functionally equivalent to the rule regarding the admission of co-conspirator and joint venture statements. We admit for substantive purposes certain out-of-court statements made by one joint venturer or co-conspirator against another on a showing by a preponderance of the evidence that there existed a joint venture or co-conspiracy between them." *Id.* (citations and footnote omitted). *See also People v. Giles,* 40 Cal.4th 833, 55 Cal.Rptr.3d

133, 152 P.3d 433, 446 (2007) (the Court of Appeal of California initially adopted a clear and convincing standard of proof but on rehearing took no position on the standard; the Supreme Court of California decided on a preponderance of the evidence-type standard: "We ... agree that '[a] standard that requires the proponent to show that it is more probable than not that the defendant procured the unavailability of the witness is constitutionally sufficient under the ... confrontation clause[ ].' ") (citation omitted).[10]

■ At this point, we see no reason to conclude that *Crawford* mandates a higher standard of proof in forfeiture by wrongdoing cases, especially since the majority of federal circuits and state courts have opted for the lesser preponderance of evidence standard, and since *Davis* declined to hold that the clear and convincing standard is essential where a defendant has invoked his constitutional confrontation right. Consequently, we hold that the trial court did not violate Mr. Gatlin's constitutional confrontation right and that, in this jurisdiction, the preponderance of the evidence standard, which we adopted in *Devonshire, supra,* continues to govern "predicate facts" in *post-Crawford* cases where the government seeks to admit grand jury testimony on the theory that the defendant is responsible for the witness's unavailability.

### The False Testimony Issue

Mr. Gatlin argues, in essence, that the trial court's rulings relating to the testimo-

10. Although the Second Circuit applies the preponderance of the evidence standard, New York State courts follow the clear and convincing evidence standard. *See People v. Geraci,* 85 N.Y.2d 359, 625 N.Y.S.2d 469, 649 N.E.2d 817, 822 (1995) (grand jury testimony is generally inadmissible but "[a]lthough we have carved out an exception to that general principle for cases in which the witness is unavailable because of the defendant's wrongful conduct, our statutory and decisional law counsels a cautious approach that permits use

of the exception only when the predicate facts are proven with the degree of certainty that the 'clear and convincing evidence' test assures") (citations omitted). Even though the Fifth Circuit applies a clear and convincing evidence test in federal cases, it recognizes a lesser standard may be applied in state courts; *see Magouirk v. Warden, Winn Correctional Ctr.,* 237 F.3d 549 (5th Cir.2001) (recognizing and applying the use of the preponderance of the evidence standard by Louisiana state courts).

ny of government witness Ray violated his Fifth and Sixth Amendment constitutional rights. Specifically he complains that the trial court refused to permit his defense counsel to withdraw as counsel and to testify after Mr. Ray falsely stated that defense counsel asked him to state that Mr. Champion, not Mr. Gatlin, had stabbed Mr. Buckman. He maintains that "there is a reasonable possibility that the uncorrected false testimony contributed to the jury's guilty verdict regarding the murder of [Mr.] Buckman." He also asserts that the trial court erred by denying his motion for a mistrial. The government emphasizes the steps taken by the trial court to overcome the impact of the false testimony, including cross-examination by defense counsel. The government also insists that "[t]here is no reasonable likelihood that [Mr.] Ray's false testimony could have affected the judgment of the jury," because, among other things, "it did not relate to the core of the case . . . [,] what happened on the night of the murder"; and "[Mr.] Ray's testimony about counsel was effectively undermined."

In terms of the factual context for the false testimony issue, the record reveals that, on cross-examination, defense counsel pressed Mr. Ray about the details of the stabbing, attempting to impeach his credibility, in part by using a transcript of a prior proceeding (relating to a codefendant in an earlier indictment). Mr. Ray suddenly blurted out: "Ain't you the same one back there, sir, told me since Damien [Champion] is dead, put it on him, let Cortez [Gatlin] go?" The following exchange between witness and defense counsel then took place:

Q: Whoa, whoa, whoa, who?

A: You. Ain't you the same lawyer?

Q: Are you accusing me of trying to get you to commit perjury?

A: Yes. Sir.

Q: When did I try and do that?

A: When I got locked up in '99 on escape behind—

Q: In '99?

A: Yes, sir. Behind the judge's chambers.

Q: I came back in '99 and told you that?

A: Yeah, you did. I said I need to talk to a lawyer. I told [the prosecutor] that.

Q: You told [the prosecutor] that I tried to get you to commit perjury?

A: Yeah, you said back there you said, look—this how you said it. You said, look, you know Damien dead, right. Let's do it like this.

Q: I said that to you?

A: Yes, you did. You said since Damien dead, let's put it on Damien and let Cortez walk. That's what you said. God as my witness you did tell me that.

Q: I said that to you?

A: Yes, you did. I remember your face. You did.

Q: Did I—did I give you my name?

A: I remember your face, sir.

Defense counsel then requested a bench conference, and advised the trial judge that he would have to testify. The judge indicated that the court and counsel for both sides would have to figure out what to do and asked counsel to move to another area. The prosecutor, Mr. Wheeler, revealed that Mr. Ray had made the accusation about defense counsel previously, but in five prior times when he was on the stand had not made it in open court. Therefore, the prosecutor "never thought that [Mr. Ray] would accuse him." Subsequently, defense counsel resumed his cross-examination.

Later, the trial court again met with counsel to discuss how to handle Mr. Ray's accusation against defense counsel. The court clearly was reluctant to have defense counsel switch from lawyer to witness. As the trial judge put it, that "is not an optimal direction for the case to go in." One of the remedies suggested by the court was an instruction to the jury to "disregard" the accusation; in addition, "the parties [would] stipulate to something to the effect that [defense counsel] did not instruct the witness to perjure himself. . . ." Defense counsel retorted, "I don't want the jury told to disregard it. I want to prove it's false." Counsel expressed the fear that jurors would believe Mr. Ray, and that the only effective way to counteract his accusation would be to allow defense counsel to testify. Eventually, the trial court decided to permit defense counsel to conduct additional cross-examination of Mr. Ray as the best way to handle the situation, rather than to permit counsel to testify or to grant a mistrial. Defense counsel established that, despite having told the prosecutor about defense counsel's alleged request that Mr. Ray implicate Mr. Champion and thereby exonerate Mr. Gatlin, Mr. Ray was never "called as a witness in any grand jury proceeding or investigation regarding that claim that [defense counsel] attempted to get [Mr. Ray] to lie in court." And, no complaint against counsel was filed with Bar Counsel. Nor was Mr. Ray called into a court hearing regarding his allegation. In addition, defense counsel addressed the issue in closing argument, leaving the clear impression that Mr. Ray's accusation was not credible, and implying that the rest of Mr. Ray's testimony was not credible.

■ Our analysis of the false testimony issue is guided by the following legal principles. "A prosecutor may not knowingly present false evidence or permit evidence, known to be false, to go uncorrected." *Hawthorne v. United States*, 504 A.2d 580, 589 (D.C.1986) (citing *Giglio v. United States*, 405 U.S. 150, 153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)). *Giglio* declared that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" *Id. Giglio, supra*, 405 U.S. at 153, 92 S.Ct. 763. "A defendant is accordingly entitled to a new trial if there is 'any reasonable likelihood' that false testimony could 'have affected the judgment of the jury.'" *Hawthorne, supra*, 504 A.2d at 589–90 (citing *Giglio, supra*, 405 U.S. at 154, 92 S.Ct. 763) (quoting *Napue v. Illinois*, 360 U.S. 264, 271, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)); *see also Woodall v. United States*, 842 A.2d 690, 696 (D.C.2004); *Keys v. United States*, 767 A.2d 255, 261 (D.C. 2001) ("A defendant has a due process right to a new trial if there is 'any reasonable likelihood' that evidence known by the government to be false could have affected the jury's verdict.") (citations omitted).

■ Here, the prosecutor did not present false evidence. Mr. Ray's accusation against defense counsel emerged unexpectedly during cross-examination. Nevertheless, after Mr. Ray's challenged accusation, the prosecutor acknowledged that Mr. Ray previously had communicated the accusation to him. The prosecutor justified not alerting the trial court and defense counsel to the accusation before Mr. Ray's testimony on the ground that the witness had not revealed it while testifying in some five previous court appearances. "[I]t is our function to review the record for [prejudicial] legal error or abuse of discretion by the trial judge, not by [government] counsel." *Woodall, supra*, 842 A.2d at 697 n. 8 (quoting *Bruce v. United States*, 617 A.2d 986, 993 (D.C. 1992)).

The trial court recognized the problem created by Mr. Ray's accusation and held rather extensive discussions with defense and government counsel in an effort to address the impact of the accusation. The court sought to fashion a remedy which would compromise neither the continuance of the trial, nor Mr. Gatlin's rights, nor the jury's perception of defense counsel's integrity. The trial court concluded that defense counsel's immediate reaction to Mr. Ray's accusation should have led the jury to cast serious doubt on Mr. Ray's accusation. In addition, the court permitted defense counsel to re-call Mr. Ray for additional cross-examination concerning his accusation during which Mr. Ray acknowledged that he had not been called before a grand jury, and had not appeared at a court hearing or before Bar Counsel, to repeat his accusation against defense counsel. Furthermore, Mr. Ray repeatedly stated that his discussion with defense counsel, which prompted his accusation at trial, took place in a downstairs holding cell, rather than in an upstairs holding area behind a courtroom, as he asserted during his initial cross-examination. But, a United States Marshal, called by the defense, testified that attorneys representing persons in "jail cases" may "speak to inmates up behind the courtrooms, not downstairs."

In light of the trial court's analysis and the additional cross-examination, we conclude that Mr. Gatlin was not prejudiced by the absence of defense counsel's testimony or "flat contradiction" of Mr. Ray's accusation; reasonable jurors could infer that Mr. Ray's accusation was false. Moreover, we note that defense counsel refused the trial court's suggestions that jurors be instructed to disregard Mr. Ray's accusation, and the parties would stipulate that defense counsel did not instruct Mr. Ray to commit perjury. Hence, we are satisfied, on this record, that the

trial court did not abuse its discretion when it rejected defense counsel's request to testify, *see State v. Peeler*, 265 Conn. 460, 828 A.2d 1216, 1224–25 (2003) (establishing a "compelling need" standard for a prosecutor's or a defense counsel's testimony at trial in order to "strike[ ] the appropriate balance between . . . the need for information and . . . the potential adverse effects on the attorney-client relationship and the judicial process . . . ."); and when it denied the defense motion for a mistrial, *see Daniels v. United States*, 738 A.2d 240, 248 (D.C.1999) (A ruling on a mistrial motion "is committed to the sound discretion of the trial court, and we 'will not overturn [its] decision unless it appears unreasonable, irrational, or unfair . . . or unless the situation is so extreme that failure to reverse would result in a miscarriage of justice.' ").

■ Finally, our review of this issue convinces us that Mr. Gatlin suffered no due process violation necessitating a new trial because there is no "reasonable likelihood that [Mr. Ray's unexpected accusation against defense counsel on cross-examination—that he attempted to suborn perjury] could have affected the jury's verdict." *Keys, supra*, 767 A.2d at 261. In *Hawthorne*, we "consider[ed] the importance of [the challenged] testimony, the extent to which [the witness'] credibility was impeached, and the independent evidence of [the appellant's] guilt" in making this determination. *Hawthorne, supra*, 504 A.2d at 591. (citation omitted). Here, although Mr. Ray was a key government witness, he was not the only one. Both Ms. Hunter, and Mr. Jones (through his grand jury testimony) presented consistent testimony clearly implicating Mr. Gatlin as the person who fatally stabbed Mr. Buckman. And, Mr. Smith, Ms. Bowman and Ms. Levy gave testimony relating to the earlier beating of Mr. Buckman after he

stole drugs and guns from the home of Mr. Champion, Mr. Gatlin's close friend (like a brother) and associate. Thus, Mr. Ray's testimony that defense counsel instructed him to implicate Mr. Champion as Mr. Buckman's murderer, did not prove to be material, especially in light of defense counsel's reaction and cross-examination. Moreover, a fair and reasonable reading of the record reveals that Mr. Ray's credibility as to the accusation against defense counsel was grievously impeached. Thus, even under the governing standard, which "is stricter than the usual harmless error standard under *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), but equivalent to the *Chapman*[11] [constitutional] harmless error standard," *Hawthorne*, 504 A.2d at 591 n. 27 (internal quotation marks and other citations omitted), Mr. Gatlin cannot prevail on the false testimony issue.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.[12]

*So ordered.*

---

11. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ("There is little, if any, difference between ... whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.").

12. After reviewing the record, we are unpersuaded by Mr. Gatlin's remaining argument that various evidentiary errors by the trial court, relating to the ADW charge, individually and cumulatively, jeopardized the fairness of his trial. Even assuming error, "[t]rial court errors that do not implicate constitutional rights do not warrant reversal if we can say with fair assurance that the judgment was not substantially swayed by the error." *Harris v. United States*, 834 A.2d 106, 127 (D.C. 2003) (citing *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).